FILED

APR 06 2015

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**NOT FOR PUBLICATION**

## UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | ) BAP No. NV-14-1474-DJuKu |
| | ) |
| WILLIAM WALTER PLISE, | ) Bk. No. 12-14727 |
| | ) |
| Debtor. | ) |
| _____ | ) |
| | ) |
| TENNILLE I. PLISE, | ) |
| | ) |
| Appellant, | ) |
| | ) |
| vs. | ) **M E M O R A N D U M**[1] |
| | ) |
| SHELLEY D. KROHN, Chapter 7 | ) |
| Trustee; WILLIAM WALTER PLISE, | ) |
| | ) |
| Appellees. | ) |
| _____ | ) |

Argued and Submitted on March 19, 2015
at Las Vegas, Nevada

Filed - April 6, 2015

Appeal from the United States Bankruptcy Court
for the District of Nevada

Honorable Linda B. Riegle, Bankruptcy Judge, Presiding

_____

Appearances:    Matthew L. Johnson of Johnson & Gubler, P.C.,
argued for Appellant Tennille I. Plise; Jacob L.
Houmand and Victoria L. Nelson of Nelson & Houmand,
P.C., argued for Appellee Shelley D. Krohn, Chapter 7
Trustee.

_____

_____

[1] This disposition is not appropriate for publication.
Although it may be cited for whatever persuasive value it may have
(see Fed. R. App. P. 32.1), it has no precedential value. See 9th
Cir. BAP Rule 8024-1.

1

Before:  DUNN, JURY, and KURTZ, Bankruptcy Judges.

Shelley D. Krohn, the Chapter 7[2] trustee ("Trustee"), filed an adversary proceeding against appellant Tennille I. Plise, alleging that Ms. Plise's prepetition divorce from Chapter 7 debtor William Walter Plise ("Debtor") was a sham, such that transfers of property to Ms. Plise pursuant to the dissolution proceedings constituted fraudulent transfers.  The Trustee's claims against Ms. Plise were settled by the payment of $425,000 to the estate.  Sometime after the bankruptcy court approved the settlement ("Settlement"), Ms. Plise filed a proof of claim, asserting that as a result of the Settlement she was owed a $425,000 prepetition domestic support obligation, later amended to $715,000, which was entitled to priority status under the Bankruptcy Code and therefore to payment ahead of the professionals employed by the Trustee.

Although we have been hampered in our review by the absence of any detailed findings of facts and conclusions of law by the bankruptcy court, we nevertheless AFFIRM the bankruptcy court's order sustaining the trustee's objection to Ms. Plise's claim, because the record on appeal supports the imposition of the doctrine of judicial estoppel against Ms. Plise to preclude her from asserting her claim in the bankruptcy case.

---

[2] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037.  All "Civil Rule" references are to the Federal Rules of Civil Procedure.

2

# I. FACTUAL BACKGROUND[3]

The following basic facts provide the framework for the litigation that underlies this appeal:

- Ms. Plise and the debtor were married on December 4, 2001.
- On September 29, 2008, Ms. Plise and the Debtor filed a Joint Petition for Divorce in the Clark County Nevada District Court ("Nevada Family Court").
- On October 24, 2008, the Nevada Family Court entered a Decree of Divorce ("Divorce Decree") that was based upon a Joint Petition For Divorce agreed to between the Debtor and Ms. Plise and filed by each as "Petitioner in Proper Person."[4]
- The debtor filed his chapter 7 petition on April 23, 2012.
- Debtor's schedules reflect that as of the petition date he owned (a) no real property, and (b) personal property valued at $4,738.71. Debtor claimed as exempt all but $2,000 of the personal property disclosed. The nonexempt personal property

---

[3] The record provided by the parties to the appeal was incomplete with respect to their assertions in connection with resolution of the Trustee's claims against Ms. Plise in the adversary proceeding. We have exercised our discretion to review the bankruptcy court's main case and adversary proceeding dockets and the documents on record therein to assist us in our consideration of this appeal. See O'Rourke v. Seaboard Sur. Co. (In re E.R. Fegert, Inc.), 887 F.2d 955, 957-58 (9th Cir. 1989); Atwood v. Chase Manhattan Mortg. Co. (In re Atwood), 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003).

[4] Ms. Plise asserts that the Debtor was represented by counsel in connection with the Joint Petition for Divorce but that she was not.

was fully encumbered.

A.   Transfers Pursuant to the Divorce Decree.

As relevant to this appeal, the Divorce Decree provided that Ms. Plise was to receive (a) a one-time lump-sum payment of child support in the amount of $1,850,000, and (b) a one-time lump-sum payment of alimony in the amount of $1,000,000.

1.   Lump-Sum Transfer For Child Support.

Ms. Plise asserts she received a lump-sum payment of $1,850,000 in satisfaction of the child support obligation, and she used these funds to purchase real property in Austin, Texas ("Austin Property") where she thereafter resided with the parties' children. Ms. Plise contends that she thereafter became ill for a 2-3 year period, precluding her from working and necessitating borrowing money "from others" to pay for her medical bills, living expenses, and attorney's fees. Ms. Plise contends that she attempted to sell the Austin Property because she needed to pay this money back.

When her sale efforts were not successful, Ms. Plise asserts she contacted the debtor because she believed he had contacts that could help her obtain a loan. Debtor referred her to Mike Halverson.[5] Ms. Plise contends she was advised by Mr. Halverson

---

[5] Mike Halverson was a close business associate of the debtor. The Chapter 7 Trustee filed twenty fraudulent transfer adversary proceedings in the underlying bankruptcy case, twelve of which named 5550 Las Vegas, LLC ("5550 Las Vegas") as a defendant and as the alter ego of the debtor.

The Settlement Agreement at issue in this appeal recites that the debtor formed 5550 Las Vegas on February 23, 2009 and was the
(continued...)

that the lender would require removing her name from the property out of concern for Texas homestead laws. She therefore "sold" the Austin Property to 13413 Shore Vista Drive, LLC ("Shore Vista"), an entity managed by Mr. Halverson, on March 29, 2012. Shore Vista then obtained a loan[6] in the amount of "approximately $850,000 to $900,000." The lender was granted a first position lien on the Austin Property for the amount of the loan; Ms. Plise received a second lien for her alleged equity in the Austin Property in the amount of $1.1 million. Ms. Plise asserts that with the loan

[5](...continued)
sole member until July 12, 2010, when he transferred his membership interest to Mr. Halverson. The allegation regarding 5550 Las Vegas in the more recent complaints provides:

> Upon information and belief, 5550 Las Vegas, LLC ("5550 Las Vegas") is a revoked Nevada Limited Liability Company in which Michael Halverson ("Halverson") was the manager and member. On or about March 8, 2013, Halverson avoided the transfer of the membership interest in 5550 Las Vegas and transferred any and all interest he held in 5550 Las Vegas to the bankruptcy estate of the Debtor including, but not limited to, all real or personal property owned or controlled by 5550 Las Vegas, all legal and equitable interests owned or controlled by 5550 Las Vegas, all tangible and intangible property interests owned or controlled by 5550 Las Vegas, or any claims for relief arising under Nevada law or the United States Bankruptcy Code out of the transfer of money from 5550 Las Vegas to third parties. Halverson further agreed to not defend, dispute, object or assist in any defense of a claim for relief for alter ego brought against 5550 Las Vegas by the Trustee.

[6] The term of the loan was short. The Settlement Statement reflects the date of the loan was March 30, 2012. The loan was due in March 2013.

proceeds she paid the loan costs and interest, and 12 months of rent.

2. Transfers For Alimony.

In October 2008, in satisfaction of the $1 million owed as alimony, Ms. Plise accepted $350,000, together with a parcel of vacant land in Colorado ("Colorado Property"), the assignment of the debtor's interest in a promissory note dated February 6, 2009 from Cracked Egg, LLC in the amount of $700,000.00, and Bank of George common stock.

Ms. Plise asserts she used the Bank of George stock (which she contends was worthless) to settle the fraudulent transfer claim Bank of George had asserted against her based on its contention that the divorce was a sham.

On September 19, 2012, Ms. Plise transferred the Colorado Property to Old Toll Road, LLC ("Old Toll Road"), an entity she wholly owns.[7] According to the Trustee, Old Toll Road was formed on September 19, 2012. When initially organized, Keith Clegg, a long-time friend of the Debtor, was the named manager. On November 1, 2012, Ms. Plise was named the manager. On April 5, 2013, the Debtor was named the manager, and he opened a bank account at the Bank of Nevada for Old Toll Road on that date. Four days later the Colorado Property was sold; the sale proceeds in the amount of $186,396.76

---

[7] Ms. Plise asserts this transfer was made to protect herself from liability after she had consented to allow county trucks to park on the Colorado Property when work was commenced on the road nearby.

6

were wired into the Old Toll Road bank account. Debtor subsequently transferred more than $140,000 of the sale proceeds to a bank account he had opened in his name on May 16, 2012, less than one month after he filed his chapter 7 petition.

B. The Trustee's Claims Against Ms. Plise.

On September 19, 2012, the Trustee filed a complaint ("Complaint") against Ms. Plise, Shore Vista, and Old Toll Road seeking to avoid fraudulent transfers pursuant to § 544(b), to recover fraudulent transfers pursuant to § 550, for turnover of estate property pursuant to § 542, and for injunctive relief pursuant to Rule 7065.[8]

On September 20, 2012, the Trustee filed a motion for a preliminary injunction ("Injunction Motion"), seeking to prevent any transfer of the Austin Property. Ms. Plise opposed the Injunction Motion ("Injunction Motion Opposition"), asserting (1) § 544 did not apply because the transfers made under the Divorce Decree had occurred nearly four years before the Debtor filed his bankruptcy case, with the result that Ms. Plise, not the Debtor, was the owner at the time the Austin Property was transferred to Shore Vista and at the time the Colorado Property was sold; (2) Nevada law, NRS Chapter 112, prohibits third parties from challenging a divorce such that the Trustee is unable to undo any of the transfers made

---

[8] The Trustee amended the complaint on October 17, 2012, to add a claim to avoid as a fraudulent transfer Ms. Plise's transfer of the Colorado Property to Old Toll Road, LLC, which had taken place the same day the adversary proceeding was filed.

7

pursuant to the Divorce Decree; (3) the bankruptcy court lacked jurisdiction over the award or adjustment of support; and (4) the Trustee was precluded from asserting that the divorce was a sham because a Nevada court previously had ruled in favor of Ms. Plise on that issue, e.g., in litigation initiated by the Bank of George against Ms. Plise. Most importantly for purposes of this appeal, Ms. Plise opposed the Injunction Motion on the basis that the bankruptcy court could not, in light of § 507, provide Ms. Plise any redress if the transactions under the Divorce Decree were unwound.

> The Court is unable to provide redress. Based on Section 507, even if the Court finds that the Debtor fraudulently transferred all of the property that the Trustee seeks, the fact remains that [Ms. Plise] has a valid, final, non-appealable domestic relations order. The ultimate result is that the Trustee would still have to first pay the monies due and owing under a super-priority, valid, unappealable Divorce Decree, before first taking a fee and paying any funds for any administrative expenses. Therefore, the Court is unable to provide redress.

Injunction Motion Opposition at 18:7-12.

In or about February of 2013, Ms. Plise and Shore Vista settled the claims the Trustee had asserted against them in the Adversary Proceeding. The relevant terms of the Settlement are as follows:

> 1. Settlement Agreement With Shore Vista and [Ms. Plise]. In settlement of the claims for relief in the Second Amended Complaint against Shore Vista and [Ms. Plise], the Parties agree that the Austin Property will be sold according to the following terms:
>
>> a. The Austin Property shall continue to be listed for sale . . . pursuant to the terms of the exclusive listing agreement entered into between Shore Vista [and its realtor] (the "Exclusive Listing Agreement"). If the Austin Property has not sold by the time the Exclusive Listing Agreement expires, the Trustee, in her sole discretion, will have the right

8

to replace [the realtor] with a real estate agent of her choosing.

b.   The listing agreement for the Austin Property shall be amended to indicate that the Trustee and Shore Vista are jointly selling the Austin Property.

c.   Any sale of the Austin Property is contingent on the written approval of both the Trustee and Shore Vista.

d.   Any proceeds from the sale of the Austin Property will first be used to satisfy any balance owed to [the holder of] the First Deed of Trust.

e.   After the First Deed of Trust . . . has been satisfied, four hundred and twenty-five thousand dollars ($425,000.00) shall be wired from escrow to the Trustee.

f.   Any funds remaining after (1) the First Deed of Trust . . . has been satisfied and (2) the four hundred and twenty-five thousand dollars ($425,000.00) has been wired to the Trustee shall be distributed to [Ms. Plise].

2.   Release of Claims.  The Trustee agrees to release [Ms. Plise] from all claims arising out of the transfer of any and all real and/or personal property related to the Divorce Decree, including the transfer of the Colorado Property, the assignment of the Debtor's interest in the promissory note dated February 6, 2009 from the Cracked Egg, LLC in the amount of seven hundred thousand dollars ($700,000.00), the payment of any income taxes owed to the Internal Revenue Service, and the transfer of common stock in the Bank of George.  Furthermore, the Trustee releases Shore Vista of any and all claims relating to the transfer of the Austin Property.

3.   Settlement Agreement With Old Toll.  The Trustee agrees to voluntarily dismiss the claims for relief in the Second Amended Complaint against Old Toll and the Colorado Property.

. . .

6.   Reservation of Rights.  Notwithstanding anything to the contrary contained in this Agreement, the Parties hereto expressly reserve unto themselves any claims or causes of action, whether at law or in equity, arising out of the non-performance of this Agreement by a Party.  The

9

Parties agree that if any Party hereto employs counsel or brings suit to enforce the terms or conditions of this Agreement, and if such Party is successful in such effort, he or it (as the case may be) shall be entitled to recover from the non-performing Party any and all damages, costs, expenses and attorneys' fees incurred as a result thereof.

On March 8, 2013, the Trustee filed a motion to approve the Settlement ("Settlement Approval Motion") reached with Ms. Plise. In her memorandum in support of the Settlement Approval Motion, the Trustee stated:

The Debtor's Schedule B provides that he only owns personal property in the amount of $4,738.71. This $4,738.71 figure includes a checking account ($988.71), a personal safe and computer ($250.00), assorted clothing ($250.00), a wedding ring and watch ($1,000.00), a 9mm Glock Pistol ($250.00), and an eighteen foot trailer ($2,000.00). Schedule C provides that the Debtor is exempting $2,738.71 of the $4,738.71 in assets. The only item of personal property that was not exempted, the eighteen foot trailer, is secured by a lien equal to its fair market value. Therefore, as of the Petition Date, the Debtor has had a no-asset bankruptcy case. The proposed Settlement Agreement is in the best interests of the creditors and the Debtor because it will result in the recovery of four hundred twenty-five thousand dollars that can be used for the benefit of creditors. Accordingly, approval of the Settlement Agreement will result in the recovery of funds that can be distributed to unsecured creditors.

Settlement Approval Motion at 10:2-12. Ms. Plise explicitly joined ("Joinder") in the Trustee's Settlement Approval Motion: "Defendant, TENNILLE I. PLISE ("Plise"), through her attorneys of the law firm of MATTHEW L. JOHNSON & ASSOCIATES, P.C., respectfully submits her joinder to the Trustee's Motion to Approve Compromise And Settlement Pursuant To Federal Rule of Bankruptcy Procedure

10

9019."[9]  Following a hearing on the Settlement Approval Motion, on March 25, 2013, the bankruptcy court entered an order ("Settlement Order") granting the Settlement Approval Motion.[10]

C.   Ms. Plise's Proof of Claim.

On July 1, 2013, the law firm of Cotton, Driggs, Walch, Holley, Woloson & Thompson ("Cotton Driggs Firm"), former counsel for the Trustee, filed its first interim application ("Cotton Driggs Fee Application") for compensation based on services the Cotton Driggs Firm had performed between July 17, 2012 and December 31, 2012 and for expenses the Cotton Driggs Firm had incurred during the period July 17, 2012 through June 27, 2013.

In opposing the Cotton Driggs Fee Application, Ms. Plise filed two documents on July 24, 2013.  The first was proof of claim 20-1 ("Priority Claim"), pursuant to which Ms. Plise asserted she was owed $425,000 as a priority domestic support obligation pursuant to

_____

[9] The balance of the Joinder reads:

> Additionally, Plise respectfully requests that the Court note in the Order Approving the Settlement Agreement that any cause of action for alleged fraudulent transfers from the Debtor to Plise are vested exclusively with the Trustee, and that once the Order approving the Settlement with the Trustee is entered, other creditors can no longer pursue fraudulent transfer actions involving transfers from the Debtor to Plise pursuant to 11 U.S.C. §544.  See 11 U.S.C. §544; In re Kimmell, 367 B.R. 174 (N.D. Cal. 2007); Hyosong (America), Inc. v. Hantle USA, Inc., No. C 10-02160 SBA, 2011 WL 835781 (N.D. Cal. Mar. 4, 2011); In re Smith Motors, 286 BR 905, 908 (N. Cal. 2002).

[10] The Settlement Order did not include the additional language Ms. Plise had requested in her Joinder.

11

§ 507(a)(1). The second was a limited opposition ("Cotton Driggs Limited Opposition") to the Cotton Driggs Fee Application. In the Cotton Driggs Limited Opposition, Ms. Plise asserted that, in settling with the Trustee, Ms. Plise did not waive her right to child support or alimony awarded through the Divorce Decree. Further, she asserted that the $425,000 paid to the Trustee as a part of the Settlement constituted exempt child support or alimony pursuant to NRS 21.090(s) and (t). On the bases of (1) Nevada exemptions she was entitled to claim in support payments, and (2) the priority payment status provided to support obligations under § 507, Ms. Plise objected to any payment to the Cotton Driggs Firm until her $425,000 claim for alimony and child support was paid.

The Trustee cried foul. In her reply to the Cotton Driggs Limited Opposition, the Trustee pointed out that, as of the Petition Date, Ms. Plise held no claim, priority or otherwise. Specifically, prior to that date, Ms. Plise had received full satisfaction from the Debtor for all support obligations due under the Divorce Decree. The Trustee further alleged that Ms. Plise's actions after the Settlement had been approved belied her claim that she was due support. In particular, the Colorado Property was sold after the Trustee released claims against Ms. Plise and Old Toll Road, and the proceeds of that sale were transferred to an account in the Debtor's name. The Trustee asserted that if Ms. Plise believed she was owed support, which is the basis upon which she allegedly acquired the Colorado Property in the first instance, Ms. Plise would have

12

retained those proceeds rather than paying them over to the Debtor. Finally, the Trustee asserted that the Settlement did not provide Ms. Plise a domestic support claim. On August 9, 2013, the bankruptcy court approved the Cotton Driggs Fee Application over the Cotton Driggs Limited Opposition.

On February 9, 2014, the law firm of Nelson & Houmand, P.C. ("N&H Firm"), current counsel for the Trustee, filed its first interim application ("N&H Fee Application") for compensation based on services the N&H Firm had performed between September 13, 2013 and February 7, 2014 and for reimbursement of expenses. Ms. Plise filed a limited opposition ("N&H Limited Opposition") to the N&H Fee Application, objecting to any payment to the N&H Firm until the Priority Claim was paid, raising the same issues she had presented in the Cotton Driggs Limited Opposition. On March 17, 2014, the bankruptcy court approved the N&H Fee Application over the N&H Limited Opposition. The order reflected that the bankruptcy court had reviewed the N&H Limited Opposition; that although awarded, any payment of fees pursuant to the N&H Fee Application remained subject to disgorgement; and that the bankruptcy court had not made a determination on the Priority Claim filed July 24, 2013.

On June 11, 2014, the Trustee formally objected ("Claim Objection") to the Priority Claim. The Trustee asserted in the Claim Objection that the Priority Claim should be disallowed because, assuming that Ms. Plise did have a claim for support against the Debtor as a result of the Settlement, that claim would not be enforceable against the bankruptcy estate where it arose

13

postpetition. In both the Cotton Driggs Limited Opposition and the N&H Limited Opposition, in an effort to avoid the application of the claims bar date ("Bar Date") to the Priority Claim, Ms. Plise stated that she had no reason to file a proof of claim until the Bankruptcy Court had granted the Settlement Approval Motion, an event which took place after the Bar Date.

The Trustee further asserted the Priority Claim was not a domestic support obligation. The alleged claim only arose after the Trustee was paid $425,000 in exchange for a release of the bankruptcy estate's fraudulent transfer claims against Ms. Plise. The Trustee pointed out that Ms. Plise did not personally transfer any funds to the Trustee where the funds came from the sale of the Austin Property titled in the name of Shore Vista; that it would be illogical for the Trustee to settle fraudulent transfer claims, which Ms. Plise had defended on the basis that they were support, only to allow Ms. Plise to file a claim for support in the bankruptcy case; and that the "claim" was not established by the Divorce Decree. The Trustee also pointed out that it was "understood that the settlement amount was going to be used by the Trustee to administer the Debtor's bankruptcy estate including paying administrative professionals and unsecured creditors."

Ms. Plise responded ("Claim Objection Response") that the Priority Claim was one for "a domestic support obligation arising from the Divorce Decree which has not been fully satisfied," and that because the Debtor's obligation to Ms. Plise was created under the Divorce Decree entered prepetition, it is not an unmatured claim

14

for support.  She further asserted that because funds had been paid to the Trustee on account of the fraudulent transfer claims raised against Ms. Plise, Ms. Plise was entitled to the protection of § 502(h) which provides:  "A claim arising from the recovery of property under section . . . 550 . . . of this title shall be determined, and shall be allowed under section (a), (b), or (c) of this section . . . the same as if such claim had arisen before the date of the filing of the petition."

Ms. Plise further stated that she reserved all of her rights to the Priority Claim in the Settlement.  In support of this position she quoted paragraph 6 of the Settlement Agreement, titled "Reservation of Rights," emphasizing language that provided the parties "expressly reserve unto themselves any claims or causes of action, whether at law or in equity, arising out of the non-performance of this Agreement by a Party."  She pointed out that the Trustee had released all claims against her for the alleged fraudulent transfers, which Ms. Plise appeared to interpret as a release of any claim that the funds transferred under the Divorce Decree as support were not actually support, but rather transfers made in an effort to remove property and funds from the reach of Debtor's creditors.  She reiterated that the Priority Claim represented debts owed to or recoverable by a former spouse and child, in the nature of support.  Finally, she asserted that, although the funds paid to the Trustee were from the sale of the Austin Property owned by Shore Vista, Ms. Plise actually "paid" them, because otherwise she would have been entitled to those funds

15

based on the second lien she held.

Ms. Plise further contended that because the source of the Priority Claim is the Divorce Decree, Nevada law precludes the Trustee from "attacking" it.

Finally, Ms. Plise asserted that the Priority Claim was timely. Although she did not file it before the Bar Date, she filed it four months after the Settlement had been approved by the bankruptcy court. Notably, at the time the Priority Claim was filed, the Trustee had not commenced distribution pursuant to § 726(a)(1), with the result that Ms. Plise asserted the claim did not lose its priority payment status.

After filing the Claim Objection Response, Ms. Plise amended the Priority Claim to include an additional $290,000 amount. With much effort, the Trustee was able to determine that the Priority Claim amount was increased to include the amount for which Ms. Plise asserted she settled the litigation Bank of George had filed against her on the basis that Ms. Plise's divorce was a sham and the transfers made pursuant to the Divorce Decree were fraudulent. It appears that Ms. Plise settled with Bank of George for $40,000 plus the return of stock, which Ms. Plise throughout proceedings in the bankruptcy court had repeatedly claimed was "worthless."[11]

---

[11] In her response to the Trustee's supplemental objection to the Priority Claim, Ms. Plise offered a valuation of the Bank of George stock in the range of $357.50-363.50 per share based on a U.S. Department of the Treasury press release. However, as the Trustee points out, those values were for Class A and Class B stock, (continued...)

At the hearing on the Claim Objection held August 28, 2014, the bankruptcy court sustained the objection based upon its finding that no domestic-support obligation was created by virtue of the Settlement Agreement. The order sustaining the Claim Objection was entered September 10, 2014 ("Claim Objection Order"), and this timely appeal followed.

## II.  JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(B).  We have jurisdiction under 28 U.S.C. § 158.

## III.  ISSUE

Whether the bankruptcy court committed reversible error when it disallowed Ms. Plise's claim.

## IV.  STANDARDS OF REVIEW

In appeals arising from a ruling on a claim objection, we review the bankruptcy court's conclusions of law de novo and its findings of fact under the clearly erroneous standard. See Allen v. U.S. Bank, NA (In re Allen), 472 B.R. 559, 564 (9th Cir. BAP 2012). Fact findings are not clearly erroneous unless they are illogical, implausible or without support in the record. Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010) (citing United States v. Hinkson, 585 F.3d 1247, 1261–62 & n.21 (9th Cir. 2009) (en banc)).

We may affirm the decision of the bankruptcy court on any basis

[11](...continued)
while the stock transferred to Ms. Plise in settlement of the obligations in the Divorce Decree was common stock.

17

supported by the record.  See ASARCO, LLC v. Union Pac. R. Co., 765 F.3d 999, 1004 (9th Cir. 2014); Shanks v. Dressel, 540 F.3d 1082, 1086 (9th Cir. 2008).

## V.  DISCUSSION

We determine that Ms. Plise is estopped from asserting the Priority Claim.  See Hamilton v. State Farm Fire & Cas. Co., 270 F.3d 778, 782-83 (9th Cir. 2001)(explaining the doctrine of judicial estoppel in relatively neutral language: "Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position.").

The Ninth Circuit used more strident language appropriate to the actions of Ms. Plise in Rockwell Int'l Corp. v. Hanford Atomic Metal Trades Council, 851 F.2d 1208, 1210 (9th Cir. 1988).

> Unlike collateral estoppel, res judicata, and equitable estoppel, judicial estoppel focuses exclusively on preventing the use of inconsistent assertions that would result in an "affront to judicial dignity" and "a means of obtaining unfair advantage."

Id.  In Rockwell Int'l, the Ninth Circuit explained that the purpose of the doctrine of judicial estoppel is "to protect against a litigant playing 'fast and loose with the courts' by asserting inconsistent positions."  Id.

In Milton H. Green Archives, Inc. v. Marilyn Monroe, LLC, 692 F.3d 983 (9th Cir. 2012), the Ninth Circuit discussed the current law on judicial estoppel under its own precedents in light of the factors identified by the Supreme Court in New Hampshire v. Maine, 532 U.S. 742, 749 (2001), to be considered in determining

18

whether the doctrine should apply in a given case. We analyze Ms. Plise's actions to determine whether to apply judicial estoppel using these factors.

1. "[A] party's later position must be clearly inconsistent with its earlier position." Id. at 750-51. The Joinder is the document which highlights Ms. Plise's inconsistent positions for purposes of this appeal. Ms. Plise had articulated in the Injunction Motion Opposition her concern that the bankruptcy court could not, in light of § 507, provide Ms. Plise any redress if the transactions under the Divorce Decree were unwound. Nevertheless, she settled with the Trustee, who agreed to accept a payment of $425,000 in return for a waiver of claims up to $2,450,000 against Ms. Plise. Ms. Plise then affirmatively joined in the Settlement Approval Motion, which contained the representation that the proceeds of the Settlement would be used to pay unsecured creditors. Ms. Plise also tried, albeit unsuccessfully, to have the Settlement Agreement insulate her from future fraudulent transfer actions that might be filed by other creditors. Having achieved protection from the bankruptcy estate with respect to the balance of the transfers made under the Divorce Decree, Ms. Plise then filed the Priority Claim, effectively saying as to the Settlement proceeds: "They're mine."

2. By her affirmative and unreserved adoption of the Settlement Approval Motion, Ms. Plise can be said to have "succeeded in persuading [the bankruptcy] court to accept [her] earlier position," i.e. that she was giving up property which she asserted

19

was acquired in satisfaction of a domestic support obligation in order to settle the Trustee's claims against her. Id. Had the bankruptcy court allowed the Priority Claim as she had requested, it would have "create[d] the perception" that the bankruptcy court had been misled in the proceedings relating to the Settlement or in the claim proceedings. This is the second factor articulated in New Hampshire. Having been unsuccessful in the bankruptcy court, Ms. Plise now asks this Panel to ignore her inconsistent position and reverse the Claim Objection Order. This we will not do.

3. The final consideration is whether allowing the Priority Claim would provide Ms. Plise an unfair advantage or impose an unfair detriment on the Trustee. Clearly, it would. The Trustee negotiated a settlement with Ms. Plise for the articulated purpose of bringing the Settlement proceeds into the bankruptcy estate for the benefit of unsecured creditors. Allowance of the Priority Claim would render the Settlement an exercise in futility.

Although the Supreme Court and the Ninth Circuit have acknowledged that the circumstances where the doctrine of judicial estoppel apply "are probably not reducible to any general formulation" (Milton H. Green Archives, Inc, 692 F.3d at 993), in this appeal the record establishes that Ms. Plise was, and is, "playing fast and loose with the courts." The Divorce Decree was the product of an agreement exclusively between the Debtor and Ms. Plise that was rubber stamped by the Family Court. Ms. Plise thereafter entered into two different six-figure settlements, one with the Bank of George and one with the Trustee, for fraudulent

20

transfer claims based on assets she received from the Debtor under the Divorce Decree. In order to reap the benefits provided by the Settlement Agreement, including resolution of future liability to the Trustee, Ms. Plise joined with the Trustee in the Settlement Approval Motion which explicitly provided that the Settlement proceeds would benefit the general unsecured creditors. Ms. Plise then filed the Priority Claim to avoid any impact on her by the Settlement and to recover the Settlement proceeds for herself. Not satisfied with that as her objective, Ms. Plise amended the Priority Claim in an effort to avoid any impact on her by her settlement with Bank of George, and to recover from the bankruptcy estate an additional $290,000. Finally, approximately two weeks after the Settlement was approved by the bankruptcy court, Ms. Plise transferred to the Debtor $140,000, the source of which can be traced back to assets transferred to her under the Divorce Decree.

In protest, Ms. Plise contends she "reserved" her rights to file the Priority Claim in the Settlement Agreement. However, Ms. Plise misreads the reservation of rights; by its explicit terms, the reserved rights relate solely to the enforcement of the Settlement Agreement itself.

As an example of "playing fast and loose with the courts," this appeal represents the paradigm. The application of judicial estoppel would have been appropriate in the claim proceedings before the bankruptcy court, and it remains appropriate now. Accordingly, the bankruptcy court did not err in sustaining the objection to Ms. Plise's claim.

## VI.  CONCLUSION

Ms. Plise settled the claims against her for fraudulent transfers.  Her efforts to avoid the financial impact of the Settlement Agreement by filing the Priority Claim are judicially estopped, as rising to the level of "playing fast and loose with the courts."  We AFFIRM the bankruptcy court's entry of the Claim Objection Order.