**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ASARCO, LLC,
                    *Plaintiff-Appellant*,

v.

UNION PACIFIC RAILROAD
COMPANY, a Utah corporation;
UNION PACIFIC CORPORATION,
                    *Defendants-Appellees*,

No. 13-35356

D.C. No.
2:12-cv-00283-
EJL

OPINION

Appeal from the United States District Court
for the District of Idaho
Edward J. Lodge, District Judge, Presiding

Argued and Submitted
July 10, 2014—Seattle, Washington

Filed August 27, 2014

Before: A. Wallace Tashima and Mary H. Murguia, Circuit
Judges, and Cormac J. Carney, District Judge.[*]

Opinion by Judge Carney

---

[*] The Honorable Cormac J. Carney, United States District Judge for the
Central District of California, sitting by designation.

**SUMMARY**[**]

**Environmental Law**

The panel reversed the dismissal of a mining company's action under § 113(f) of the Comprehensive Environmental Response, Compensation, and Liability Act, seeking a share of cleanup costs paid for environmental harm at the Coeur d'Alene Superfund Site.

The panel held that the mining company's claim was not barred by CERCLA's three-year statute of limitations for claims seeking contribution after entry of a judicially approved settlement. The panel held that even though the first amended complaint included allegations that were expressly disclaimed in the original complaint, it related back to the date of the original complaint under Fed. R. Civ. P. 15(c)(1)(B) because it arose out of the same conduct, transaction, or occurrence as that set forth in the original complaint. The panel held that the original complaint was timely because Rule 6(a)'s general rule for counting time, excluding the day of the event that triggered the period, applied.

The panel held that the mining company's claim was not unambiguously barred by a prior agreement that settled the defendant's claims against the mining company at the same site. The panel concluded that a "mutual release" provision in the parties' settlement agreement did not unambiguously release the claim in this case.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Gregory Evans (argued) and Laura G. Brys, Integer Law Corporation, Los Angeles, California; Linda R. Larson, Russell C. Prugh, and Meline G. MacCurdy, Marten Law PLLC, Seattle, Washington, for Plaintiff-Appellant.

Carolyn McIntosh (argued) and Maxine Martin, Patton Boggs LLP, Denver, Colorado; Ausey H. Robnett III, Paine Hamblen LLP, Coeur d'Alene, Idaho; Gail L. Wurtzler, Davis Graham & Stubbs LLP, Denver, Colorado, for Defendants-Appellees.

**OPINION**

CARNEY, District Judge:

ASARCO, LLC ("Asarco") appeals the district court's dismissal of its contribution action brought under § 113(f) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601–9675. Asarco seeks to recover from Union Pacific Railroad Co. and Union Pacific Corp. (together, "Union Pacific") a share of $482 million in cleanup costs Asarco paid for environmental harm at the Coeur d'Alene Superfund Site in Northern Idaho. The district court dismissed the action under Federal Rule of Civil Procedure 12(b)(6), concluding that although Asarco's claim was timely, it was barred by a 2008 settlement agreement between the parties that settled Union Pacific's claims against Asarco at the same site. We conclude that Asarco's claim was timely, but that the parties' 2008 settlement agreement did not unambiguously release Asarco's

claim here.    We therefore reverse the district court's judgment dismissing the case under Rule 12(b)(6).

## BACKGROUND

Asarco and Union Pacific both participated in nearly a century of mining operations in the Coeur d'Alene River watershed, a 1,500-square-mile area located in Idaho's northern panhandle.  Asarco operated over 20 mines in the Coeur d'Alene site, and Union Pacific built rail lines and transported ore and other materials for the region's mining and smelting facilities.    In 1983, the Environmental Protection Agency ("EPA") listed the Coeur d'Alene site on the CERCLA National Priorities List.  Since then the site has undergone over 30 years of cleanup efforts by the EPA, the State of Idaho, and potentially responsible parties, including Asarco and Union Pacific.

In the 1990s, the United States, the State of Idaho, and the Coeur d'Alene Tribe each filed various claims against Asarco and other mining companies for response costs and natural resource damages at the Coeur d'Alene site.  These actions were consolidated in 2003 and, after a 78-day trial, Judge Lodge of the United States District Court for the District of Idaho issued an order apportioning liability based on the volume of mining waste released into the basin's waterways. Asarco was found at least 22 percent responsible.  *Coeur d'Alene Tribe v. Asarco, Inc.*, 280 F. Supp. 2d 1094, 1121 (D. Idaho 2003).

In 2005, before the damages portion of the consolidated case was concluded, Asarco filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code. Through bankruptcy, Asarco sought to resolve approximately

$6.5 billion in environmental liabilities at 53 sites throughout the country.  Union Pacific and the United States both filed proofs of claim.

Union Pacific's proofs of claim sought a general unsecured claim for payment of freight charges and response costs at numerous sites, including $52 million in CERCLA response costs Union Pacific had paid at the Coeur d'Alene site.  In 2008, the parties entered into a settlement agreement (the "UP Settlement"), which resolved "all the claims by UP or claims which UP could have filed against ASARCO," and allowed Union Pacific a general unsecured claim of about $4 million.  Upon the parties' joint motion, the bankruptcy court approved the settlement.

The UP Settlement contains a "mutual release" provision, which states in relevant part:

> ASARCO agrees . . . to hereby release, remise, and discharge UP . . . from any and all damages, losses, expenses, costs, liabilities, claims, demands, suits, causes of action, and complaints, of any kind, character or description, in law or in equity, whether known or unknown, *arising out of or in any way connected with . . . Remaining Sites Costs*.  (Emphasis added.)

The UP Settlement defines "Remaining Sites Costs" to mean "costs of response under CERCLA *incurred by UP* at the Remaining Sites," including the Coeur d'Alene site. (Emphasis added.)

The United States also filed proofs of claim in Asarco's bankruptcy case, asserting that Asarco was jointly and severally liable for more than $2 billion in cleanup costs at the Coeur d'Alene site. The bankruptcy court held a hearing to estimate the United States' claims against Asarco, but before the court ruled, Asarco and the United States executed an agreement settling the United States' Coeur d'Alene claims ("US CDA Settlement").

The US CDA Settlement resolved Asarco's liability for all remaining response costs and natural resource damages associated with the Coeur d'Alene site. Under the settlement, Asarco agreed that the United States would be entitled to general unsecured claims totaling about $482 million. For its part, the United States covenanted not to sue Asarco for further CERCLA costs "[w]ith respect to the Coeur d'Alene Site." The bankruptcy court approved the proposed settlement on June 5, 2009.

On June 5, 2012, Asarco filed the underlying contribution action, seeking to recoup from Union Pacific a share of the $482 million it paid under the US CDA Settlement. Asarco alleged that it had paid more than its allocable share of costs at the Coeur d'Alene site and demanded that Union Pacific pay "its equitable share of any overpayment of costs by Asarco." Asarco's original complaint defined the Coeur d'Alene site as "a 1,500-square mile area located in northern Idaho and eastern Washington," including "a 21-square mile area around [the Bunker Hill mining] complex" and the upper and lower basins of the Coeur d'Alene River. The original complaint provided that "[f]or purposes of this action, the Coeur d'Alene Basin . . . excludes the drainage of the North Fork of the Coeur d'Alene River." Less than two months later, however, Asarco filed a First Amended Complaint

("FAC") as of right under Rule 15(a)(1), and amended the definition of "Coeur d'Alene Basin" to include the North Fork drainage area that was originally excluded.

Union Pacific filed a motion to dismiss Asarco's FAC under Rule 12(b)(6), arguing that Asarco's claim was barred by the statute of limitations, the UP Settlement, res judicata, judicial estoppel, Union Pacific's contribution protection, and Asarco's lack of any contribution rights. The district court rejected Union Pacific's statute of limitations arguments, but nevertheless granted the motion because it concluded that the action was barred by the UP Settlement's release provisions.

The district court acknowledged Asarco's argument that the defined term "Remaining Sites Costs" limited Asarco's release to claims for costs "incurred by UP," but reasoned that if it read the agreement as "limiting the releases to only Union Pacific's claims" the releases would then "be anything but mutual." *ASARCO, LLC v. Union Pac. R.R.*, 936 F. Supp. 2d 1197, 1204 (D. Idaho 2013). The district court concluded that "[g]iven the scope of the definitions used in the FAC and the plain language of the [UP] Settlement, it is clear that the claim raised in the FAC is precluded by the mutual release language of the [UP] Settlement." *Id.* at 1204–05. The district court therefore dismissed Asarco's action and declined to rule on Union Pacific's remaining defenses. *Id.* at 1206.

## STANDARD OF REVIEW

We review de novo the district court's dismissal for failure to state a claim under Rule 12(b)(6). *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1121 (9th Cir. 2013). We may affirm the district court's dismissal on any

ground supported by the record.  *Id.* (citing *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 322 F.3d 1064, 1076–77 (9th Cir. 2003)).

Dismissal under Rule 12(b)(6) on the basis of an affirmative defense is proper only if the defendant shows some obvious bar to securing relief on the face of the complaint.  *See Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1179 (9th Cir. 2013) ("[T]he assertion of an affirmative defense may be considered properly on a motion to dismiss where the 'allegations in the complaint suffice to establish' the defense." (quoting *Jones v. Bock*, 549 U.S. 199, 215 (2007))); 5B Charles Alan Wright et al., *Federal Practice and Procedure* § 1357 (3d ed. 1998) ("[A] dismissal under Rule 12(b)(6) is likely to be granted by the district court only in the relatively unusual case in which the plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to securing relief . . . .").  If, from the allegations of the complaint as well as any judicially noticeable materials, an asserted defense raises disputed issues of fact, dismissal under Rule 12(b)(6) is improper. *Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir. 1984) (per curiam).

## ANALYSIS

## I

We first consider whether Asarco's FAC is barred by CERCLA's three-year statute of limitations for claims seeking contribution after entry of a judicially approved settlement.  *See* 42 U.S.C. § 9613(g)(3).  Union Pacific contends that Asarco's FAC was untimely because (1) it did not relate back to the date of the original complaint under

Rule 15(c)(1)(B), and (2) even if it did, the original complaint was filed one day too late. We review de novo both the question whether an amended pleading relates back under Rule 15(c)(1)(B), *Martell v. Trilogy Ltd.*, 872 F.2d 322, 325 (9th Cir. 1989), and the question whether a claim is barred by the statute of limitations, *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 779 (9th Cir. 2002).

**A**

An otherwise time-barred claim in an amended pleading is deemed timely if it relates back to the date of a timely original pleading. Under Rule 15(c)(1)(B), an amendment asserting a new or changed claim relates back to the date of the original pleading if the amendment "arose out of the conduct, transaction, or occurrence set out . . . in the original pleading." An amended claim arises out of the same conduct, transaction, or occurrence if it "will likely be proved by the 'same kind of evidence' offered in support of the original pleading." *Percy v. S.F. Gen. Hosp.*, 841 F.2d 975, 978 (9th Cir. 1988) (quoting *Rural Fire Prot. Co. v. Hepp*, 366 F.2d 355, 362 (9th Cir. 1966)). To relate back, "the original and amended pleadings [must] share a common core of operative facts so that the adverse party has fair notice of the transaction, occurrence, or conduct called into question." *Martell*, 872 F.2d at 325. The relation back doctrine of Rule 15(c) is "liberally applied." *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1259 n.29 (9th Cir. 1982).

**1**

This case presents an issue of first impression in this Circuit: Can an amended pleading relate back if it includes

allegations that were expressly disclaimed in the original pleading? We hold that it can, and that in such cases the test continues to be the Rule 15(c)(1)(B) standard itself — whether the amended claim arises out of the same conduct, transaction, or occurrence as that set forth in the original complaint.

In so holding, we are mindful of two competing concerns. On the one hand, the relation back doctrine is to be liberally applied. *See id.*; *see also Rural Fire*, 366 F.2d at 362 (noting that Rule 15(c) "is liberally applied especially if no disadvantage will accrue to the opposing party"). Indeed, Rule 15's purpose "is to provide maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities." 6 Wright et al., *supra*, § 1471. Gone are the code pleading days when a party was "irrevocably bound to the legal or factual theory of the party's first pleading." *Id.*

On the other hand, the purpose of the statute of limitations — protecting defendants from stale claims — is also to be respected. *See Credit Suisse Sec. (USA) LLC v. Simmonds*, 132 S. Ct. 1414, 1420 (2012); *see also FDIC v. Conner*, 20 F.3d 1376, 1385 (5th Cir. 1994). Amendments that significantly alter the pleadings could require the opposing party to start over and prepare the case a second time. 6A Wright et al., *supra*, § 1497. Consistent with the protective purpose of the statute of limitations, "[f]airness to the defendant demands that the defendant be able to anticipate claims that might follow from the facts alleged by the plaintiff." *Percy*, 841 F.2d at 979.

Rule 15(c) strikes a balance between these competing concerns by providing that once litigation has been

commenced, an opposing party is on notice that the pleading party may subsequently raise any claims or defenses that form part of the same conduct, transaction, or occurrence as the original pleading. Thus, we have said, "[i]t is the 'conduct, transaction, or occurrence' test of Rule 15(c) which assures that the relation back doctrine does not deprive the defendant of the protections of the statute of limitations." *Santana v. Holiday Inns, Inc.*, 686 F.2d 736, 739 (9th Cir. 1982); *see also Conner*, 20 F.3d at 1386 ("In the end . . . , the best touchstone for determining when an amended pleading relates back to the original pleading is the language of Rule 15(c) . . . ."); 6A Wright et al., *supra*, § 1497 (explaining that even where "[a]mendments . . . go beyond the mere correction or factual modification of the original pleading and significantly alter the claim or defense alleged in that pleading[,] . . . the search under Rule 15(c) is for a common core of operative facts in the two pleadings").

Our decision in *Rural Fire Protection Co. v. Hepp* is instructive. There, the plaintiffs' timely original complaint claimed unpaid wages under the Fair Labor Standards Act for pay periods between September 5, 1959, and April 30, 1960. 366 F.2d at 361. During trial, and after the statutory limitations period had expired, plaintiffs were granted leave to amend their complaint to claim wages for an additional pay period from April 30 to May 19, 1960. *Id.* Ruling on the defendants' statute of limitations argument, we reasoned that "there [could] be no question but that the amended pleading was based on the same transaction, was to be proved by the same kind of evidence (appellant's time records), and did not take appellant by surprise." *Id.* at 362. The amendment, therefore, related back. *Id.*

We do not believe it would have made any difference had the original complaint in *Rural Fire* explicitly excluded wages for the April 30 to May 19, 1960 pay period. The plaintiffs there could have conceivably done so because, for example, they incorrectly believed they had no colorable claim to wages for that pay period and thus determined in good faith to limit the scope of their original claim. But suppose they were to learn later while conducting discovery that they in fact did have a colorable basis to seek wages for that period — would they then be confined to the boundaries of their precise pre-discovery claim?

We think not, for such a rule would clearly be inconsistent with the limited role Rule 15(c) assigns to the initial pleading. Under Rule 15(c)'s liberal standard, a plaintiff need only plead the general conduct, transaction, or occurrence to preserve its claims against a defendant. The exact contours of those claims — the facts that will ultimately be alleged and the final scope of relief that will be sought — can and should be sorted out through later discovery and amendments to the pleadings. *See* 6 Wright et al., *supra*, § 1471 ("[Initial pleadings] no longer carry the burden of fact revelation and issue formulation, which now is discharged by the discovery process."). We see no reason to disturb the limited role assigned to initial pleadings under Rule 15 where a party in good faith initially disclaims certain facts or relief. Parties should not be discouraged from limiting their initial pleadings to claims and defenses that have evidentiary support. Nor should they fear that doing so will foreclose them from amending their pleadings if new facts come to light after further investigation and discovery.

Of course, Union Pacific is correct that notice is an essential element in the relation back determination. But

Rule 15 does not require that a pleading give notice of the exact scope of relief sought. Rather, it must give "fair notice of the transaction, occurrence, or conduct called into question." *Martell*, 872 F.2d at 325. So long as a party is notified of litigation concerning a particular transaction or occurrence, that party has been given all the notice that Rule 15(c) requires. When a defendant is so notified, "the defendant knows that the whole transaction described in it will be fully sifted, by amendment if need be, and that the form of the action or the relief prayed or the law relied on will not be confined to their first statement." *Id.* at 326 (quoting *Barthel v. Stamm*, 145 F.2d 487, 491 (5th Cir. 1944)).

Accordingly, we hold that even where an amendment trenches on factual ground that the original pleading said would be off limits, the standard is the same. In such cases, the standard to be applied is Rule 15(c)'s liberal "conduct, transaction, or occurrence" test.

**2**

Applying the Rule 15(c)(1)(B) standard here, we agree with the district court that Asarco's FAC relates back to the date of its original complaint. The key change in Asarco's FAC was its inclusion of a geographical area within the Coeur d'Alene basin — the drainage of the North Fork of the Coeur d'Alene River — that was explicitly excluded in its original complaint. Asarco's original complaint asserted that

> [f]or purposes of this action, the Coeur d'Alene Basin refers to *the watershed of the South Fork* of the Coeur d'Alene River, the main stem of the Coeur d'Alene River and its

floodplain, including the lateral lakes and associated wetlands, and Lake Coeur d'Alene, *but excludes the drainage of the North Fork* of the Coeur d'Alene River.  (Emphasis added.)

Less than two months later, Asarco filed its FAC, which redefined the "Coeur d'Alene Basin" to encompass the "*the watersheds of the North Fork and the South Fork* of the Coeur d'Alene River, the main stem of the Coeur d'Alene River and its floodplain, including the lateral lakes and associated wetlands, and Lake Coeur d'Alene."  (Emphasis added.)

Notwithstanding that change, we conclude that Asarco's original complaint clearly put Union Pacific on notice of the conduct, transaction, or occurrence set forth in the FAC. Both pleadings concern Asarco's and Union Pacific's historical activities at the "Coeur d'Alene Site" — "a 1,500-square mile area located in northern Idaho and eastern Washington."[1]  Both pleadings seek contribution based on the same consent decree, which resolved Asarco's liability for CERCLA response costs in the entire Coeur d'Alene basin. And, in order to determine the scope of Union Pacific's contribution protection, both pleadings would inevitably require an assessment of Union Pacific's consent decrees settling claims for cleanup costs in the Coeur d'Alene basin. These factual overlaps are more than enough.  Asarco's FAC will doubtless "be proved by the 'same kind of evidence'" that would have been offered in support of its original

---

[1] As the district court observed, "the Coeur d'Alene Basin geographical area is large and encompasses both the North and South Forks of the Coeur d'Alene River."

complaint.  *Percy*, 841 F.2d at 978 (quoting *Rural Fire*, 366 F.2d at 362).

Liberally applying Rule 15(c), we conclude, as did the district court, that Asarco's FAC relates back to the date of its original complaint.

## B

Of course, relation back does not help Asarco if the original complaint was not timely in the first instance. CERCLA § 113(g)(3) provides that "[n]o action for contribution for any response costs or damages may be commenced more than 3 years after . . . the date of . . . entry of a judicially approved settlement with respect to such costs or damages."  42 U.S.C. § 9613(g)(3)(B).  Because Asarco filed its original complaint on June 5, 2012 — on precisely the third anniversary of the date the US CDA Settlement was entered by the bankruptcy court — the timeliness of Asarco's complaint depends on whether Federal Rule of Procedure 6(a)'s general rule for counting time applies.

Under Rule 6(a), the day of the event that triggers the period is excluded for purposes of computing the period's end date.  *See* Fed. R. Civ. P. 6(a)(1).  This is known as the anniversary method.  If the anniversary method is applied, the first day of the period would be June 6, 2009 (the day after the US CDA Settlement was entered), and the last day for filing would be June 5, 2012.  Under an alternative method, known as the calendar-date method, the day of the event that triggers the period is counted as the first day.  If the calendar-date method is applied, the first day of the period would be June 5, 2009, and the last day for filing would be June 4, 2012.  Asarco's original complaint would thus be timely

under Rule 6(a)'s anniversary method, but not under the calendar-date method.

Rule 6(a)'s method applies by default to "any statute that does not specify a method of computing time." Fed. R. Civ. P. 6(a); *see also Patterson v. Stewart*, 251 F.3d 1243, 1246 (9th Cir. 2001) ("Rule 6(a) is widely applied to federal limitations periods" and "can apply to 'any applicable statute' in the absence of contrary policy expressed in the statute." (quoting *Union Nat'l Bank v. Lamb*, 337 U.S. 38, 40–41 (1949))). Here, CERCLA § 113(g)(3) says nothing about the method of counting to be applied, nor does it manifest any intent to deviate from Rule 6(a)'s method.

Union Pacific argues that CERCLA § 113(g)(3) specifies a method of computing time because it directs that the limitations period begins to run on "the *date* of . . . entry of a judicially approved settlement." Appellee's Br. at 35 (emphasis added). But that simply shows that § 113(g)(3) specifies the day of the triggering event. It does "not specify a method of computing time." Fed. R. Civ. P. 6(a). Indeed, Rule 6(a)(1) implicitly recognizes that the "day of the event that triggers the period" and the first day of the period for computation purposes do not have to be the same day. Fed. R. Civ. P. 6(a)(1)(A); *see United States v. Inn Foods, Inc.*, 383 F.3d 1319, 1325 (Fed. Cir. 2004) ("[S]tatutes of limitations . . . often identify the date on which a time period starts, but not the date on which the period ends.").

Moreover, Union Pacific's reliance on § 113(g)(3)'s language runs contrary to our precedent. In *Patterson v. Stewart*, we applied Rule 6(a)'s method to nearly identical language in the Antiterrorism and Effective Death Penalty Act's ("AEDPA") limitations provision, 28 U.S.C.

§ 2244(d)(1). *See* 251 F.3d at 1245–46. Just as CERCLA § 113(g)(3) directs that the period runs from the *date* the judicially approved settlement is entered, AEDPA directs that

> [t]he limitation period *shall run* from the latest of . . . the *date* on which the judgment became final . . . [,] the *date* on which the impediment to filing an application . . . is removed, . . . the *date* on which the constitutional right asserted was initially recognized by the Supreme Court, . . . or . . . the *date* on which the factual predicate of the claim . . . could have been discovered.

28 U.S.C. § 2244(d)(1) (emphasis added). Yet notwithstanding AEDPA's clear language that the period runs from the date of a triggering event, we concluded in *Patterson* that "AEDPA does not provide an alternative method for computing time periods." 251 F.3d at 1246. We reach the same conclusion as to CERCLA § 113(g)(3).

Union Pacific points to nothing in CERCLA's language or legislative history that suggests that Congress intended to deviate from Rule 6(a)'s method of calculation. *See id.*; *see also Inn Foods*, 383 F.3d at 1325 ("[C]ourts have chosen to follow the guidance of Rule 6(a) absent clear language to the contrary in the statute . . . ."). Accordingly, we apply Rule 6(a)'s anniversary method and conclude that Asarco's original complaint, as well as its FAC, was timely under CERCLA § 113(g)(3).

## II

Having determined that Asarco's FAC was timely, we now consider whether it is barred by the UP Settlement's "mutual release" provision. The meaning of a settlement agreement is, as with all contracts, a question of law subject to de novo review. *City of Emeryville v. Robinson*, 621 F.3d 1251, 1261 (9th Cir. 2010).

The parties' key dispute is whether the UP Settlement unambiguously releases Asarco's claim here against Union Pacific.[2] If the settlement agreement is ambiguous, then interpretation of the agreement presents a fact issue that cannot be resolved on a motion to dismiss. *See State Farm Mut. Auto. Ins. Co. v. Fernandez*, 767 F.2d 1299, 1301 (9th Cir. 1985) ("The interpretation of a contract presents a mixed question of law and fact. The existence of an ambiguity must be determined as a matter of law. If an ambiguity exists, a question of fact is presented." (citations omitted)); *see also Scott*, 746 F.2d at 1378 (affirmative defenses may not be asserted by motion to dismiss if they raise disputed issues of fact); 11 Richard A. Lord, *Williston on Contracts* ["*Williston*"] § 33:42 (4th ed. 2014) ("[T]here is unanimity" that evidence of the surrounding circumstances is necessary "when an ambiguity . . . exist[s].").

We conclude that the UP Settlement is ambiguous. The agreement's "mutual release" provision states, in relevant part:

---

[2] Because the settlement agreement was filed with the bankruptcy court and is a publicly available record, it is properly subject to judicial notice, *see In re E.R. Fegert, Inc.*, 887 F.2d 955, 957–58 (9th Cir. 1989), and thus may be considered on a Rule 12(b)(6) motion to dismiss.

> ASARCO agrees . . . to hereby release, remise, and discharge UP . . . from any and all damages, losses, expenses, costs, liabilities, claims, demands, suits, causes of action, and complaints, of any kind, character or description, in law or in equity, whether known or unknown, *arising out of or in any way connected with . . . Remaining Sites Costs*. (Emphasis added.)

Significantly, "Remaining Sites Costs" are separately defined in the agreement as "costs of response under CERCLA *incurred by UP* at the Remaining Sites," (emphasis added), and "Remaining Sites" are in turn defined to include the Coeur d'Alene site. Read together with these definitions, the "mutual release" provision releases all claims held by Asarco that arise out of or are in any way connected with Coeur d'Alene response costs *incurred by Union Pacific*. The agreement does not explicitly release Coeur d'Alene response costs *incurred by Asarco*.

Generally, "language will be deemed ambiguous when it is reasonably susceptible to more than one interpretation." 11 *Williston* § 32:2. Here, the release provision could plausibly mean, as Union Pacific reads it, that Asarco's contribution claim against Union Pacific is released because the claim is broadly related to CERCLA response costs incurred by Union Pacific. But this is not the only reasonable interpretation. The release provision could also plausibly mean that Asarco's contribution claim against Union Pacific is reserved, not released, because the claim only relates to response costs incurred by Asarco. After all, the limitation to costs incurred by Union Pacific could have easily been replaced with "incurred by UP *or Asarco*," had that been the parties' intent.

Because both parties' interpretations are reasonable, the mutual release provision is ambiguous.

Asarco's interpretation is supported by the agreement's repeated references to the release of *Union Pacific's* claims. The agreement states that it is "intended to serve as a comprehensive settlement of all the claims *by UP* or claims which *UP could have filed against ASARCO* with respect to . . . Remaining Sites Costs," (emphasis added), and that "the mutual releases set forth in Section [V] apply to all claims UP may have filed, or had a right to file, in the ASARCO Chapter 11 case" and not to "any matters other than those expressly specified therein." It also notes that it is an agreement "[i]n settlement and satisfaction of all claims and causes of action *of UP* . . . ." (Emphasis added.)

Union Pacific's interpretation, by contrast, is inconsistent with these references and renders superfluous the phrase "incurred by UP" in the definition of Remaining Sites Costs. *See* 11 *Williston* § 32:5 ("[E]very word, phrase or term of a contract must be given effect," and courts should avoid accepting interpretations that "render[] part of the writing superfluous."). And while it is true that the "mutual release" provision extends to "any and all claims" that are "in any way connected with" Remaining Sites Costs, "it is an accepted principle that general words in a release are limited always to that thing or those things which were specially in the contemplation of the parties at the time when the release was given." *Id.* § 32:10; *see also id.* ("[S]pecific words [in a release] will limit the meaning of general words if it appears from the whole agreement that the parties' purpose was directed solely toward the matter to which the specific words or clause relate."). Here, the release's general "in any way

connected with" language is restricted by its more specific limitation to "costs incurred by UP."

Reading the contract the way Asarco suggests does not, as the district court found, render the release "anything but mutual." *ASARCO*, 936 F. Supp. 2d at 1204. To the contrary, the release of both parties' claims regarding response costs incurred by Union Pacific — the subject of the parties' settlement — has the effect of preventing both parties from later claiming that their compromise amount as to those costs was too high or too low in light of later developments.

We therefore conclude that the UP Settlement is ambiguous because it can be reasonably understood to release only claims involving Remaining Sites Costs *incurred by Union Pacific*. It was error for the district court to conclude otherwise.[3]

## CONCLUSION

Although we agree with the district court that Asarco's FAC was timely, we conclude that the district court erred by dismissing Asarco's contribution claim on the basis of an ambiguous settlement agreement. We therefore reverse the district court's dismissal of Asarco's contribution action and remand for further proceedings consistent with our opinion.

**REVERSED and REMANDED.**

---

[3] We decline to affirm dismissal of the action on the basis of any of the additional grounds raised by Union Pacific because to do so would require us to resolve disputed facts in Union Pacific's favor. *See Scott*, 746 F.2d at 1378.