**IN RE: INTERNATIONAL MANUFACTURING GROUP, INC., Debtor.**

**Beverly N. McFarland, Chapter 11 Trustee, Plaintiff,**

**v.**

**General Electric Capital Corporation, Defendant.**

**Case No. 14–25820–D–11**
**Adv. Pro. No. 15–2130–D**

United States Bankruptcy Court, E.D. California.

DATE: September 9, 2015, TIME: 10:00 a.m., DEPT: D

Signed September 10, 2015

Christopher Daniel Sullivan, San Francisco, CA, for Plaintiff.

Jonathan R. Doolittle, San Francisco, CA, Alex Terras, Reed Smith LLP, Chicago, IL, for Defendant.

### *MEMORANDUM DECISION*

ROBERT S. BARDWIL, United States Bankruptcy Judge

This is the motion of defendant General Electric Capital Corporation ("GECC") to dismiss the complaint of the plaintiff, Beverly McFarland, who is also the trustee in the chapter 11 case in which this adversary proceeding is pending (the "trustee"), pursuant to Fed.R.Civ.P. 9(b) and 12(b)(1), made applicable in this proceeding by Fed. R. Bankr.P. 7009 and 7012(b), for failure to plead fraud with particularity and failure to state a claim upon which relief can be granted. The plaintiff has filed opposition, GECC has filed a reply, and the court has heard oral argument. For the following reasons, the motion will be denied.

In ruling on a Rule 12(b)(6) motion, a court "accept[s] as true all facts alleged in the complaint, and draw[s] all reasonable inferences in favor of the plaintiff." *al-Kidd v. Ashcroft*, 580 F.3d 949, 956 (9th Cir.2009), citing *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1043 n.2 (9th Cir.2008). The court assesses whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *al-Kidd*, 580 F.3d at 956, citing *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868, (2009), in turn quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

By her complaint, the trustee seeks to avoid four transfers of $500,000 each made by an entity named Olivehurst Glove Manufacturers, LLC ("Olivehurst") to GECC as actual fraudulent conveyances, pursuant to § 548(a)(1)(A) of the Bankruptcy Code,[1] and to recover the value of the transfers from GECC, pursuant to § 550. The transfers were made within the year prior to the filing of the chapter 11 petition of International Manufacturing Group, Inc. ("IMG"), the debtor in the case in which this adversary proceeding is pending. Olivehurst has been substantively consolidated into IMG's bankruptcy estate. GECC makes five arguments in support of its

---

1. Unless otherwise indicated, all statutory references are to the United States Bankruptcy Code, Title 11, United States Code.

contention that the complaint fails to state a claim upon which relief can be granted. The court will take them in the order presented by GECC.[2]

### I. The Fraudulent Transfer Versus Preference Issue

First, GECC contends the trustee's claim is a preference claim, not a fraudulent transfer claim, and that, as a preference claim, it is time-barred because all of the transfers were made more than 90 days before the date IMG filed its petition, May 30, 2014. There is no dispute that the transfers were made outside the 90–day period, and therefore cannot be recovered as preferences. The question is whether, even if they could have been recovered as preferences if they had been made within the 90 days, they might be fraudulent transfers as well. GECC cites *Boston Trading Group, Inc. v. Burnazos,* 835 F.2d 1504 (1st Cir.1987), for the proposition that "fraudulent transfer laws cannot be used to recover payments to legitimate lenders where the transferee engaged in fraud to raise the money used to repay the lender." GECC's Motion, filed July 24, 2015 ("Mot."), at 10:15–17.

In *Boston Trading,* a court-appointed receiver for a company that managed the funds of commodities investors sought to recover as actual fraudulent conveyances payments made by the company's owners, Shaw and Kepreos, from the company's funds, to the individual who had sold them the company, Burnazos, toward the purchase price. The evidence showed that Shaw and Kepreos had been churning investors' accounts by making unnecessary trades in order to generate commissions; the receiver alleged Burnazos knew or should have known about their dishonest activity.

The court held that where an individual uses his corporation's money, which he obtained dishonestly, to pay his debt to a creditor "who knows of, but did not participate in, [the] dishonesty," the payment is not recoverable as an actual fraudulent conveyance. 835 F.2d at 1510. The court's discussion and holding both strongly suggest the court believed that a preference, which the payments to Burnazos clearly were, cannot also be a fraudulent transfer. The court made this blanket statement: "The cases and the commentators ... state that fraudulent conveyance law does not seek to void transfers in a ... circumstance known as a 'preference.'" *Id.* In explanation, the court stated that the purpose of the fraudulent transfer laws is *not* to achieve an equal distribution among creditors (*id.* at 1508–09), but "to see that the debtor uses his limited assets to satisfy *some* of his creditors...." *Id.* at 1509. The court added that "to find an actual intent to defraud creditors when ... an insolvent debtor prefers a less worthy creditor, would tend to deflect fraudulent conveyance law from one of its basic functions (to see that an insolvent debtor's limited funds are used to pay some worthy creditor), while providing it with a new function (determining which creditor is the more worthy)." *Id.*

In short, the *Boston Trading* court came very close to holding, if it did not actually do so, that a transfer that would constitute a preference if made within the preference period cannot also be an actual fraudulent conveyance. However, the court did not also find that a preference cannot be a constructive fraudulent conveyance. Instead, it remanded for a retrial on the issue of whether Burnazos gave a "fair equivalent" in exchange for the payments. 835 F.2d at 1513–14. The court did hold,

---

**2.** GECC's contention that the complaint fails to state fraud with particularly is woven throughout the motion, not separately treated; the court addresses it in like fashion.

as to the "good faith" defense to a constructive fraudulent transfer claim, that lack of good faith cannot be found from the mere fact that the creditor received a preference, even where the creditor knew the payment was made with improperly obtained funds. *Id.* at 1511–12.

> Whatever "good faith" may mean ... we believe it does not ordinarily refer to the transferee's knowledge of the source of the debtor's monies which the debtor obtained at the expense of other creditors. To find a lack of "good faith" where the transferee does not participate in, but only knows that the debtor created the other debt through some form of, dishonesty is to void the transaction because it amounts to a kind of 'preference'—concededly a most undesirable kind of preference, one in which the claims of alternative creditors differ considerably in their moral worth, but a kind of preference nonetheless. And all the reasons that militate against finding a § 7 violation ('actual fraud') in such circumstances ... militate with at least equal force against finding a § 4 violation ('constructive fraud').

*Id.* at 1512 (citations omitted).[3]

GECC's reliance on *Boston Trading* is not persuasive in this case for several reasons. First, as the trustee points out, the case involved only state fraudulent transfer law (in particular, the law of Massachusetts); the cases the court cited in support of its conclusion that a preference cannot also be an actual fraudulent conveyance involved only state law, not § 548 of the Bankruptcy Code. GECC's only response on this point is to note that "Section 548 is based on the Uniform Fraudulent Conveyance Act" (GECC's Reply, filed Sept. 2, 2015 ("Reply"), at 4:25), on which the state

fraudulent transfer laws are also based. The answer is too pat. Although the state and federal statutes are "similar in form and substance" (*In re United Energy Corp.*, 944 F.2d 589, 594 (9th Cir.1991)), they are not identical. *See Plotkin v. Pomona Valley Imports (In re Cohen)*, 199 B.R. 709, 712 (9th Cir. BAP 1996) ["The differences between the fraudulent transfer provisions in the Bankruptcy Code and the Uniform Fraudulent Transfer Act are central to this appeal."]; *see also Jobin v. McKay (In re M & L Bus. Mach. Co.)*, 84 F.3d 1330, 1338 (10th Cir.1996)["[W]e are not persuaded ... that the definitions of good faith under ... state fraudulent conveyance laws should be adopted in interpreting § 548(c). Many of these provisions contain language different than the language used in § 548(c) and ... involve policy concerns not applicable here."].

Second, as the trustee points out, the statutory language itself strongly suggests that a transfer may be avoidable as both a preference and a fraudulent transfer under federal bankruptcy law. The Bankruptcy Code provides: "Except to the extent that a transfer ... voidable under *this section* is voidable under section ... *547* of this title," a transferee that takes for value and in good faith may retain the property transferred. § 548(c) (emphasis added). Were preferences and fraudulent transfers mutually exclusive, this language would be meaningless.

Third, as the trustee also points out, if preferences and fraudulent transfers were mutually exclusive, trustees in Ponzi scheme cases would be unable to recover payments made to earlier investors at the expense of later ones except those made in the 90–day preference period. Yet

---

**3.** As discussed below, this analysis of the good faith standard appears to be contrary to Ninth Circuit law.

"[c]ourts have routinely applied [state fraudulent transfer law] to allow receivers or trustees in bankruptcy to recover monies lost by Ponzi scheme investors. The Ponzi scheme operator is the 'debtor,' and each investor is a 'creditor.' The profiting investors are the recipients of the Ponzi scheme operator's fraudulent transfer." *Donell v. Kowell*, 533 F.3d 762, 767 (9th Cir.2008) (citations omitted). "The policy justification is ratable distribution of remaining assets among all the defrauded investors." *Id.* at 770.[4] As the trustee puts it, "[i]f creditor status were enough to immunize a transfer from section 548 avoidance by magically transforming it into a preference, then a trustee could never avoid transfers made as return of principal under section 548" (Trustee's Opposition, filed Aug. 26, 2015, at 16:20–17:1), which trustees can do in cases of actual fraudulent transfers to transferees not acting in good faith. *Id.* at 771 ["Under the actual fraud theory, the receiver may recover the entire amount paid to the winning investor, including amounts which could be considered 'return of principal.' However, there is a 'good faith' defense that permits an innocent winning investor to retain funds up to the amount of the initial outlay."].

Fourth, a close analysis of *Boston Trading* reveals that it does not stand for the proposition for which GECC cites it. As stated in its reply, GECC cites the case as "establish[ing] that fraudulent transfer claims do not lie against legitimate creditors receiving payment on legitimate debt, even where the transferee may have had reason to suspect the source of the funds and knew that the transferor was a fraudster." Reply at 3:16–18. Where GECC goes wrong is in focusing on the status, knowledge, and behavior of the *transfer-*

*ee*—as, for example, a "legitimate creditor receiving payment on legitimate debt" and the *transferee's* knowledge "that the transferor was a fraudster," whereas for purposes of an actual fraudulent conveyance, the initial focus is on the *transferor* and only the transferor. That is, the first question the court must decide is whether the *transferor* made the transfer "with actual intent to hinder, delay, or defraud" his or her creditors. § 548(a)(1)(A). There is nothing in the statute to suggest that a payment on a legitimate debt to a legitimate creditor cannot be an actual fraudulent conveyance if it was made with the actual intent on the part of the transferor to hinder, delay, or defraud his or her creditors.

This is where GECC departs from the actual holding in *Boston Trading* ; that is, the holding as applied to the facts in the case, as opposed to the court's general conclusions about fraudulent transfers and preferences. The court acknowledged that the Massachusetts statute it was considering "makes 'fraudulent' every transfer made 'with actual intent' (as opposed to 'intent presumed in law') to 'hinder, delay or defraud ... creditors.' " *Boston Trading*, 835 F.2d at 1510. The court then held, with regard to the specific facts in the case:

> In effect, the Receiver argues that Shaw and Kepreos took the $ 473,000 from BTG by fraud (or other dishonest means) and paid it to Burnazos who had full knowledge of their dishonesty.
> We rephrase the legal question slightly both to reflect the evidence and to avoid the potentially confusing coincidence that we are dealing with a form of initial dishonesty (i.e., the 'churning' of accounts by Shaw and Kepreos) that itself happens to be called fraud. Suppose

---

**4.** This latter statement blunts GECC's insistence on the differing purposes behind prefer-

ence and fraudulent conveyance law as decisive.

that S & K, officers of Corporation C, obtain C's money through dishonest means (larceny, fraud, etc.) and use it to pay a debt that S & K owe B, a transferee who knows of, but did not participate in, S & K's dishonesty. Does [the Massachusetts actual fraudulent transfer statute] permit C to recover its money from B? We think the district court correctly ruled that [it] does not.

First, we have found no modern case ... that has found a fraudulent conveyance in such circumstances. That is not surprising, for the fraud or dishonesty in this example concerns *not S & K's transfer to B,* but the *manner in which the original debt to C arose.* Fraudulent conveyance law is basically concerned with *transfers* that 'hinder, delay or defraud' creditors; it is not ordinarily concerned with how such debts were created.

*Id.* (first emphasis added). In other words, the court found no actual intent to defraud in the transfer the receiver was challenging, only in the manner in which the transferors had acquired the money in the first place.

The court later referred to the facts before it, "where the only fraud concerns the *source* of the funds transferred" (*id.* at 1513 (emphasis in original)), and concluded that "the only, 'fraud' shown in respect to Shaw and Kepreos concerns the *source* of the debt to NIS, not the *transfer* to Burnazos. That kind of fraud—dishonesty in the *creation* of the debt—is (in the circumstances present here) not the kind of fraud that the [Massachusetts actual fraudulent transfer statute] addresses." *Id.* at 1517 (emphasis in original). In other words, the only fraud the court found was in the way the transferors had acquired the money they transferred to the transferee; there was no evidence the transferors made the transfer—the one challenged by the receiver—with the actual intent to hinder, delay, or defraud creditors. The case simply does not support the conclusion GECC draws from it—that regardless of the transferor's intent in making the challenged transfers, "where, as here, the transfers at issue are used to pay a legitimate creditor a legitimate debt those transfers are not 'voidable' in the first instance...." Reply at 3:13–15.

GECC fares no better with the second case it cites, although the facts appear at first glance more similar to those in this case. *Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.),* 403 F.3d 43 (2nd Cir.2005), involved a debtor company that "was looted by its controlling shareholders." 403 F.3d at 46. The bankruptcy trustee then sued, under New York fraudulent transfer law, one of the debtor's lenders, State Street Bank, "which suspected the fraud and extricated itself in a way that, according to [the trustee], facilitated the victimization of other lenders and the continued looting of [the debtor] itself." *Id.* The bankruptcy court dismissed the trustee's complaint on a Rule 12(b)(6) motion; the district court affirmed, holding, with respect to the trustee's actual fraudulent transfer claims, that the trustee, although he had alleged actual knowledge of the fraud on the part of State Street, "had not alleged that State Street 'participated in' or 'induced' the [controlling shareholders'] fraud." *Id.* at 49.

The factual allegations in *Sharp Int'l* are similar to those in the present case. In that case, the controlling shareholders "falsified sales, inventory, and accounts receivable, and invented customers, in order to report fictitious revenue on [the company's] nonpublic financial records" (403 F.3d at 46), fraudulently reporting that its sales were much higher than they were, thus enabling the shareholders to borrow more

and more money, which they then diverted to themselves. After its loans were made, State Street began to suspect problems from the company's "refusal to comply with accounting procedures required under the [parties'] loan agreement," its "fast growth and voracious consumption of cash" (*id.* at 47), and State Street's responsible officer's experience with a fraud at another company. State Street hired both outside counsel and a financial investigation firm to conduct a formal investigation. It also asked for more information about the company's customers, asked to see its outside auditor's work papers, requested formal confirmation of accounts receivable, reviewed checks for insider payments, and reviewed Dun & Bradstreet reports on several of the company's customers. When this information was either refused or turned up yet more suspicious circumstances, the trustee alleged, State Street "arranged quietly for [the shareholders] to repay the State Street loan from the proceeds of new loans from unsuspecting creditors. . . ." *Id.*

The court of appeals found these allegations insufficient to support a claim against State Street for aiding and abetting breaches of fiduciary duty because they did not sufficiently allege that State Street knowingly induced or participated in the fraud. 403 F.3d at 50. Although it assumed for purposes of its decision that "State Street knew about the looting as well as about the use of phony books and records to obtain loans" (*id.*), the court found that "the complaint says no more than that State Street relied on its own wits and resources to extricate itself from peril, without warning persons it had no duty to warn." *Id.* at 51. As to the actual

fraudulent conveyance claim, however, the focus was, as in *Boston Trading,* on the absence of fraud in the particular transfer the trustee sought to avoid. The court held that the claim "fails for the . . . reason that [the trustee] inadequately alleges fraud with respect to the transaction that [he] seeks to void, i.e., [the debtor's] $ 12.25 million payment to State Street." *Sharp Int'l,* 403 F.3d at 56, citing *Boston Trading,* 835 F.2d at 1510, for the proposition that "[f]raudulent conveyance law is basically concerned with transfers that 'hinder, delay or defraud' creditors; it is not ordinarily concerned with how such debts were created." "The fraud alleged in the complaint relates to the manner in which [the debtor] obtained new funding from the Noteholders, not [the debtor's] subsequent payment of part of the proceeds to State Street." *Sharp Int'l,* 403 F.3d at 56.

In contrast, in the present case, the complaint contains detailed allegations that, taken as true, would support a finding that the transfers to GECC were made with the actual intent on the part of the transferor to hinder, delay, or defraud creditors.[5] The complaint alleges, first, that each of the transfers was made in furtherance of the Ponzi scheme in that, by causing the transfers to be made, its mastermind, Deepal Wannakuwatte, "hoped to appease GECC, thereby prolonging the duration of the fraudulent scheme by: (a) avoiding any adverse final judgment or findings of fact in litigation; (b) preventing knowledge of his various fraudulent schemes—and by extension, the 'wholesale' division fraud—from becoming more widespread; and/or (c) otherwise enabling

---

**5.** It is important to note that the verbs, as used in § 548 (a) (1) (A), are in the disjunctive; thus, the trustee need establish only one of the three with respect to the payments to GECC—that they were made with actual intent to hinder creditors, the actual intent to delay creditors, or the actual intent to defraud creditors. *In re Stanton,* 457 B.R. 80, 93–94 (Bankr.D.Nev.2011); *In re Roca,* 404 B.R. 531, 543–44 (Bankr.D.Ariz.2009).

IMG to remain in operation and the fraud to continue." Trustee's Complaint, filed June 16, 2015 ("Compl."), at 15:15–19. The complaint goes on:

> at the time each of the Settlement Transfers was made, Deepal Wannakuwatte understood that causing those transfers to be made would inevitably harm IMG's and Olivehurst's creditors. Wannakuwatte knew that he had operated a Ponzi scheme, that he had repeatedly defrauded investors into providing financing for IMG's functionally non-existent "wholesale" division, and that IMG's investors would not be repaid when his scheme ended. Wannakuwatte further knew that Olivehurst, IMG, and Relyaid were hopelessly insolvent. Deepal Wannakuwatte knew that causing the Settlement Transfers would harm investors by both: (a) prolonging the scheme and (b) reducing the amount of funds available to repay creditors. Finally, Wannakuwatte knew that using funds to pay off GECC, rather than invest in product, constituted a fraud upon the investors whom had provided funds to Olivehurst.

*Id.* at 16:1–3. The complaint also alleges sufficient ownership and control by Wannakuwatte over Relyaid, IMG, and Olivehurst to impute his intent to them.

These allegations are more than sufficient to state a claim under §§ 548 and 550 upon which relief can be granted. To be clear, there was no indication in either the *Boston Trading* or the *Sharp Int'l* decision that the plaintiff's complaint contained such allegations. For the reasons stated, the court rejects GECC's contention that the trustee's claim is nothing more than a time-barred preference claim.

## II. The Question of Duty

■ Next, GECC contends the complaint cannot stand because "the Trustee can never plead facts which would create the duty upon which her fraudulent transfer claim is premised." Mot. at 4:6–7. The problem with the argument is simple: duty is not an element of a fraudulent conveyance claim. Thus, there is no requirement that the plaintiff plead or prove the transferee had any sort of duty.

GECC frames the issue in terms of law other than the law of fraudulent conveyances:

> GE Capital did not owe a duty to its borrower and guarantors beyond any duties expressed in the underlying Equipment Loan Agreement.... A lender's decision to exercise rights granted by contract cannot form the basis of a fraudulent transfer claim because no duty to a guarantor or other creditors is breached under these circumstances. The Trustee does not and cannot allege that anything in the Equipment Loan Agreement created a duty to IMG or its creditors requiring GE Capital to disclose anything to anyone about its efforts to collect on the loan. Furthermore, even assuming a failure to disclose material facts known only to one party, no cause of action lies unless there is a fiduciary duty or confidential relationship imposing a duty to disclose. The Trustee does not allege any duty or confidential relationship which required GE Capital to disclose anything to IMG's creditors.

Mot. at 13:3–5; 13:19–14:5 (citations omitted). The authority GECC cites for these propositions, *Sipe v. Countrywide Bank,* 690 F.Supp.2d 1141, 1153 (E.D.Cal.2010), and Cal. Civ.Code 1710(3), has nothing to do with fraudulent conveyance law.[6]

---

**6.** GECC also cites *Sharp Int'l,* 403 F.3d at 52, n. 2, which, as discussed above, was a fraudu-

lent conveyance case; however, GECC's citation is to a section of the opinion concerning

In its reply, GECC seems to back away from its theory that a breach of duty is an element the trustee must plead and instead frame the duty issue more in terms of whether GECC acted in good faith when it took the payments. The court will return to this aspect of the discussion below.

### III. The Ponzi Scheme Presumption

Next, GECC claims the trustee's complaint fails because it does not "includ[e] specific facts supporting a reasonable inference that the challenged transfers are connected to a Ponzi scheme" (Mot. at 14:4–5), and therefore, the Ponzi scheme presumption of actual fraud does not apply. GECC relies heavily on the fact that it is not alleged to have been an investor in the Ponzi scheme. First, the court has already concluded that the trustee's complaint sufficiently alleges actual fraud on the part of the transferor to state a claim; thus, application of the Ponzi scheme presumption is not necessary.

▮ However, the court will also deny the motion on the independent basis that the allegations of the complaint are sufficient to state a claim based on the Ponzi scheme presumption. The trustee has cited a number of cases supporting the proposition that, depending on the connections between the Ponzi scheme and the payments to the lenders, the presumption may be applied against commercial lenders who were not investors in the Ponzi scheme. GECC, on the other hand, cites *Klein v. Bd. of Trs. of the Cal. State Univ. (In re Moriarty)*, 2014 Bankr.LEXIS 4802 (Bankr.C.D.Cal.2014). In that case, a couple named Moriarty made a donation to Cal Poly which Cal Poly agreed to and did use to purchase a new video scoreboard for its stadium and to put the name of the couple's business at the top of the scoreboard. When the couple later filed bank-

ruptcy, the trustee in their case sued to avoid the transfer under § 544 of the Bankruptcy Code and California fraudulent transfer law. The court granted Cal Poly's Rule 12(b)(6) motion—with leave to amend—because the

> complaint does not contain facts describing the Moriarty Ponzi Scheme nor does it contain specific facts to support a reasonable inference that the subject transfers were connected to the Moriarty Ponzi Scheme. Furthermore, Klein's complaint does not allege sufficient facts to form the basis for a finding that the subject transfers actually hindered, delayed or defrauded a creditor of the Debtor or that the Debtor intended the subject transfers to do so on the date of the transfer.

2014 Bankr.LEXIS 4802, at *27.

The case does not support GECC's position here because, unlike the trustee in *Moriarty*, the trustee has alleged sufficient connections between the Ponzi scheme and the payments to GECC to state a claim to relief based on the Ponzi scheme presumption. First, she has made detailed allegations concerning the Ponzi scheme itself. She has also alleged IMG routinely used the name of consolidated debtor Relyaid (GECC's borrower) in its marketing materials to potential investors in the scheme; that Wannakuwatte pled guilty and was convicted for his role in the scheme; that a large portion of the loan proceeds from GECC were deposited into "the primary bank account through which Ponzi scheme payments to investors were made" (Compl. at 11:16); that other proceeds went to Wannakuwatte, his spouse, IMG, and another consolidated entity; that the funds used to make the payments to GECC came from IMG investors; and that, based on

a claim for aiding and abetting the breach of a fiduciary duty.

the facts alleged above, the payments were made in furtherance of the Ponzi scheme.

### IV. GECC as a Net Loser

GECC next argues that "[t]he Trustee cannot have it both ways." Mot. at 16:13. "She relies on the Ponzi scheme presumption while refusing to recognize that the net winner rule applies. Were the Ponzi scheme presumption applicable, and the transfers at issue were part of the underlying scheme, thus giving rise to the presumption, that presumption operates only against 'net winners.'" Mot. at 16:13–16. (It is undisputed that the payments made to GECC totaled less than the amount GECC loaned Relyaid.)

 This argument improperly conflates the Ponzi scheme presumption and the "net winner rule."[7] The Ponzi scheme presumption comes into play only with respect to the transferor's intent in making the challenged transfers; that is, it is relevant solely to the trustee's case-in-chief for avoidance of an actual fraudulent conveyance. The "net winner rule," in contrast, concerns only the issue whether the recipient of the transfer gave reasonably equivalent value to the transferor in exchange for the transfer. Thus, it comes into play solely in connection with (1) the trustee's case-in-chief for avoidance of a constructive fraudulent conveyance under § 548(a)(1)(B) and/or the related state law provision, and (2) the "for value" portion of

the transferee's "good faith and for value" defense under § 548(c) and/or related state law provisions. The "net winner" rule is really nothing more than the recognition that a Ponzi scheme investor has a restitution claim against the debtor for the amounts the investor paid into the scheme, the satisfaction of which constitutes reasonably equivalent value for the payments the investor received back before the scheme collapsed. This brings the court to GECC's final argument.

### V. The Issue of Good Faith

 GECC's final argument is that "[a]ssuming the Trustee adequately pled a fraudulent transfer claim, the complaint must be dismissed as GE Capital is a good faith creditor which took for value." Mot. at 18:17–18. The problem here is that GECC's good faith is a component of its good faith and for value defense, which, in the context of an actual fraudulent conveyance, is an affirmative defense. "It is not incumbent on the plaintiffs to plead lack of good faith on defendants' part because lack of good faith is not an element of a plaintiff's claim under Section 548(a)(1)[ (A) ]." *Bayou Superfund, LLC v. WAM Long/ Short Fund II, L.P. (In re Bayou Grp., LLC)*, 362 B.R. 624, 639 (Bankr.S.D.N.Y. 2007); *see also Brandt v. KLC Fin., Inc. (In re Equip. Acquisition Res., Inc.)*, 481 B.R. 422, 429 (Bankr.N.D.Ill.2012); *Picard v. Merkin (In re Bernard L. Madoff Inv.*

---

7. The presumption is simply stated: "[T]he mere existence of a Ponzi scheme is sufficient to establish actual intent to defraud." *Donell*, 533 F.3d at 770 (citations omitted, internal quotation marks omitted). The net winner "rule," more accurately called the "netting rule," is simple as well:

> Amounts transferred by the .Ponzi scheme perpetrator to the investor are netted against the initial amounts invested by that individual. If the net is positive, the receiver has established liability, and the court then determines the actual amount of liabil-

ity, which may or may not be equal to the net gain, depending on factors such as whether transfers were made within the limitations period or whether the investor lacked good faith. If the net is negative, the good faith investor is not liable because payments received in amounts less than the initial investment, being payments against the good faith losing investor's as-yet unsatisfied restitution claim against the Ponzi scheme perpetrator, are not avoidable within the meaning of UFTA.

*Id.* at 771.

*Sec., LLC)*, 440 B.R. 243, 256 (Bankr. S.D.N.Y.2010).

■ Whether GECC acted in good faith is a question of fact that would ordinarily not be appropriately resolved on a motion to dismiss. "The element of good faith under section 548(c) of the Code, bearing upon a transferee's motivations, is indisputably a factual question that may not be determined on the face of [a] complaint." *In re Bernard L. Madoff Inv. Sec.*, 440 B.R. at 256. However, GECC contends that "based on the allegations in the Complaint viewed in the light most favorable to the Trustee, GE Capital satisfies its burden to establish good faith under section 548(c)." Mot. at 19:16–18.

"Dismissal under Rule 12(b)(6) on the basis of an affirmative. defense is proper only if the defendant shows some obvious bar to securing relief on the face of the complaint." *Asarco, LLC v. Union Pac. R.R. Co.*, 765 F.3d 999, 1004 (9th Cir.2014) (citations omitted). On the other hand, "[i]f, from the allegations of the complaint as well as any judicially noticeable materials, an asserted defense raises disputed issues of fact, dismissal under Rule 12(b)(6) is improper." *Id.* (citation omitted). In GECC's view, the complaint fails because it does not allege GECC knew of the Ponzi scheme and because the "red flags" alleged in the complaint "do not come close to suggesting knowing or reckless participation" in the Ponzi scheme. Mot. at 19:19–20. The argument fails for two reasons. First, as discussed below, "knowing or reckless participation" in the Ponzi scheme is not the appropriate standard for the good faith test in this circuit. GECC's reliance in its motion on *Sharp Int'l* and in its reply on *B.E.L.T. Inc. v.*

*Wachovia Corp.*, 403 F.3d 474 (7th Cir. 2005), is misplaced. Both cases were decided under state fraudulent transfer laws (New York and Illinois, respectively), and both applied a standard for assessing good faith that is not the standard in the Ninth Circuit under § 548(c). Second, the court is not inclined to determine the factual issues attendant to a good faith defense on a Rule 12(b)(6) motion.

■ "[G]ood faith is not susceptible of precise definition" (*In re Agricultural Research & Tech. Group, Inc.*, 916 F.2d 528, 536 (9th Cir.1990) ("Agretech") (citation omitted, internal quotation marks omitted)), and the analysis, being intensely factual, must be made on a case-by-case basis. *Meeks v. Red River Entm't (In re Armstrong)*, 285 F.3d 1092, 1096 (8th Cir. 2002). Nevertheless, the courts have provided guidance. Thus, "courts look to what the transferee objectively 'knew or should have known' in questions of good faith, rather than examining what the transferee actually knew from a subjective standpoint." *Agretech*, 916 F.2d at 535–56. Facts that should have put a reasonable person on notice of a fraudulent scheme, which would have been discovered through a diligent inquiry, constitute bad faith in receiving fraudulent transfers. *Id.* at 539; *see also Woods & Erickson, LLP v. Leonard (In re AVI, Inc.)*, 389 B.R. 721, 736 (9th Cir. BAP 2008) [looking to what the transferee objectively "knew or should have known," not what he knew from a subjective standpoint]; *Plotkin*, 199 B.R. 709 at 720 ["Facts sufficient to warrant a finding of inquiry notice are ... sufficient to defeat the good faith that is essential to the § 548(c) safe harbor."].[8]

---

8. Other circuits apply the same or a similar standard. Thus, "[a] transferee does not act in good faith when he has sufficient [actual] knowledge to place him on inquiry notice of the debtor's possible insolvency." *Goldman v. Capital City Mortg. Corp. (In re Nieves)*, 648 F.3d 232, 238 (4th Cir.2011) (citation omitted). "[G]ood faith under § 548(c) should be

GECC's framing of the issue in its reply crystallizes the distinction between its view of the applicable good faith standard and the one just described, which applies in the Ninth Circuit. In GECC's view, "'bad faith' is encouraging, aiding, abetting, or concealing a further fraud, embezzlement or Ponzi scheme...." Reply at 2:27. As just discussed, the standard in this circuit for a transferee's good faith defense is not limited to someone who "encouraged, aided, abetted, or concealed" a fraud.

For the reasons stated, the court concludes the plaintiff's complaint contains factual allegations sufficient to state a claim to relief under § 548(a)(1)(A), and the motion will be denied. The court will issue a minute order.

measured objectively and ... if the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and a diligent inquiry would have discovered the fraudulent purpose, then the transfer is fraudulent." *Jobin*, 84 F.3d at 1338 [10th Circuit].

"[T]he recipient of a voidable transfer may lack good faith if he possessed enough knowledge of the events to induce a reasonable person to investigate." *Bonded Fin. Servs. v. European Am. Bank*, 838 F.2d 890, 897–98 (7th Cir.1988).