FILED

JUL 22 2016

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**ORDERED PUBLISHED**

# UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

In re:                                     )    BAP Nos.  AZ-14-1497-JaJuKu
                                           )              AZ-15-1040-JaJuKu
DONALD GARY SHANNON and                    )              (Consolidated)
MAI DOAN SHANNON,                          )
                                           )    Bk. No.   2:10-bk-35640-BKM
                Debtors.                   )
_____        )    Adv. No.  2:11-ap-00260-EPB
                                           )
ANDRES CARDENAS; TERESA                    )
CARDENAS,                                  )
                                           )
                Appellants,                )
                                           )
v.                                         )    **O P I N I O N**
                                           )
DONALD GARY SHANNON; MAI DOAN              )
SHANNON,                                   )
                                           )
                                           )
        Appellees.                         )
_____        )

Argued and Submitted on May 20, 2016
at Phoenix, Arizona

Filed – July 22, 2016

Appeal from the United States Bankruptcy Court
for the District of Arizona

Honorable Eddward P. Ballinger, Jr., Bankruptcy Judge, Presiding

---

Appearances:    H. Troy Romero of Romero Park P.S. argued for
                appellants Andres Cardenas and Teresa Cardenas;
                Neal H. Bookspan of Jaburg & Wilk, P.C. argued for
                appellees Donald Gary Shannon and Mai Doan
                Shannon.

---

Before: JAIME,[1] JURY, and KURTZ, Bankruptcy Judges.

---

[1]Hon. Christopher D. Jaime, United States Bankruptcy Judge
for the Eastern District of California, sitting by designation.

JAIME, Bankruptcy Judge:

Creditors Andres Cardenas and Teresa Cardenas ("Cardenases") appeal from an order denying their request for an order declaring that a debt owed by debtors Donald Gary Shannon and Mai Doan Shannon ("Shannons") is non-dischargeable in the Shannons' bankruptcy case and the judgment entered on that order discharging the debt. The bankruptcy court concluded that the Cardenases failed to prove several elements of their non-dischargeability claim under 11 U.S.C. § 523(a)(2)(A),[2] which excepts from discharge debts for, among other things, money and property to the extent obtained by false pretenses, a false representation, or actual fraud.

The Cardenases also appeal the bankruptcy court's order and judgment awarding costs and attorney's fees with interest to the Shannons, arguing that the action before the bankruptcy court was based in fraud and misrepresentation and not contract.

For the reasons explained below, we AFFIRM the bankruptcy court's ruling that the Cardenases failed to prove non-dischargeability under § 523(a)(2)(A), we AFFIRM the bankruptcy court's award of costs to the Shannons in the amount of $5,002.10, and we VACATE and REMAND the bankruptcy court's award of $72,691.00 in attorney's fees to the Shannons.

///

---

[2]Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

2

## I.    INTRODUCTION

The dispute below and this appeal arise out of a longstanding business and personal relationship between the Cardenases and the Shannons. It began in 2005 when Mr. Cardenas purchased vacant land and a dilapidated building located at 30333 Pacific Highway South, Federal Way, Washington ("Washington Property") for $1,000,000.00, with Ms. Shannon's assistance. It continued with a fraud and negligent misrepresentation lawsuit the Cardenases filed against the Shannons in Washington state court in which the Cardenases obtained a default judgment in excess of $1,000,000.00 against the Shannons after the Washington Property was lost to foreclosure. The adversary proceeding ensued when the Shannons moved to Arizona and filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code.

The Cardenases commenced an adversary proceeding in the Shannons' chapter 7 case in which they sought to have the debt created by the Washington state court default judgment declared non-dischargeable under § 523(a)(2)(A). After a three-day trial during which the bankruptcy judge heard testimony from numerous witnesses and judged their credibility, the bankruptcy court entered an order denying the Cardenases' request for an order providing that any debt owed to them based on the Washington state court default judgment be deemed non-dischargeable in the Shannons' bankruptcy case. Entry of a judgment, as amended, discharging that debt followed. The bankruptcy court concluded that the Cardenases failed to carry their burden of proof on two elements of the § 523(a)(2)(A) claim. It also concluded that the Cardenases failed to prove their damages were proximately caused

3

by their reasonable reliance on any representations made by the Shannons.

In post-trial proceedings, the bankruptcy court awarded the Shannons their costs and attorney's fees as the prevailing parties on the Cardenases' § 523(a)(2)(A) claim.

The Cardenases first appealed from the adverse order and judgment discharging the debt created by the Washington state court default judgment. A subsequent appeal from the order and judgment awarding costs and attorney's fees followed. This court consolidated both appeals.

## II. **FACTS**[3]

### A. **The Parties**

Before moving to Arizona, the Shannons resided in Washington where they established a successful bookkeeping and accounting practice. Ms. Shannon began her career with the Internal Revenue Service as an enrolled agent. She is also a licensed real estate agent with numerous years of real estate experience.

Mr. Cardenas is a Mexican immigrant. Although he lacks an extensive formal education and his command and understanding of the English language are limited, he is a fairly sophisticated and experienced businessman. He has established an impressive empire of Mexican-themed restaurants throughout Washington. He owned as many as twenty restaurants, and he currently owns at least fifteen. Throughout his career, Mr. Cardenas has

---

[3]Because the parties provided limited excerpts from the trial transcripts, we exercise our discretion to review the bankruptcy court's docket for the complete trial transcript record. See Woods & Erickson, LLP v. Leonard (In re AVI, Inc.), 389 B.R. 721, 725 n.2 (9th Cir. BAP 2008).

4

personally managed and overseen his restaurant holdings and other business operations in Washington and Oregon. He also has experience renovating and selling real properties. Mr. Cardenas always communicated with Ms. Shannon in English.

The Cardenases and the Shannons met sometime around 1998 and formed a personal and business relationship. Through her tax and accounting business, for a number of years Ms. Shannon provided accounting, payroll, and tax services for all of the Cardenases' restaurants. As a result of their work for the Cardenases, the Shannons received an annual six-figure income.

In addition to accounting, payroll, and tax services, Ms. Shannon also represented Mr. Cardenas in real estate matters. They had partnered successfully and profitably on the rehabilitation of a former bank property where Ms. Shannon oversaw and managed the purchase, renovations, and sale of the building. Although Mr. Cardenas worked with Ms. Shannon on real estate transactions, on the first day of trial he testified that he did not rely on her for advice in real estate matters.

**B.    The Washington Property**

Without performing any due diligence or obtaining an appraisal, Mr. Cardenas purchased the Washington Property in 2005 for $1,000,000.00 cash as the property was about to be sold to another buyer. Ms. Shannon represented Mr. Cardenas in that transaction. Mr. Cardenas used his personal funds to purchase the Washington Property. However, the property was subsequently titled in the name of Mazatlan Properties, LLC ("MPL"), a limited liability company of which the Cardenases were the sole members when the Washington Property was purchased.

5

The Washington Property sat vacant for approximately a year. It was vandalized, gutted of its fixtures and copper wiring, and a target for graffiti.

By the summer of 2006, Mr. Cardenas decided he no longer wanted the Washington Property. He retained Ms. Shannon as the listing agent in 2006 and she unsuccessfully attempted to sell the property through 2008. She then approached Mr. Cardenas with a proposal to renovate and sell the Washington Property.

**C.    The Agreement**

The Washington state court action and the adversary proceeding arise out of the failed business venture between Mr. Cardenas and Ms. Shannon for the purchase, renovation, and sale of the Washington Property. It is in that context that the Cardenases accused Ms. Shannon of making false representations and engaging in other deceitful conduct in an effort to obtain the Washington Property from Mr. Cardenas without payment. Ms. Shannon denied those accusations.

An initial oral understanding between Mr. Cardenas and Ms. Shannon provided for the renovation and sale of the Washington Property, required Ms. Shannon to furnish funds for renovations to the property, and required Ms. Shannon to pay $1,000,000.00 to Mr. Cardenas upon renovation and sale of the property. That much is undisputed.

The parties' understanding was subsequently memorialized in two writings, both of which are entitled "Amendment of Operating Agreement of Mazatlan Properties, LLC" (the "First Amendment" and "Second Amendment"). Following discussions, the First Amendment would have made Ms. Shannon and one of her associates equal

6

members in MPL with the Cardenases, stated that Ms. Shannon and her associate would provide funds necessary for renovations to the Washington Property, and would have made Ms. Shannon a co-manager in MPL with Mr. Cardenas. The First Amendment, admitted at trial as Exhibit 17, is neither dated nor signed. The Second Amendment, admitted at trial as Exhibit 18, is signed and dated August 23, 2008. It transferred the Cardenases' interest in MPL and the Washington Property to Ms. Shannon, made Ms. Shannon the sole member and manager of MPL, and gave her the power and authority to sell or lease the Washington Property.

The Cardenases asserted that they never agreed to the terms in the Second Amendment. They accused Ms. Shannon of using a signature page from the First Amendment for the Second Amendment without their knowledge or authorization. They also accused Ms. Shannon of not renovating and selling the Washington Property within a promised three- to five-month time period, using funds other than her own funds (which they claimed she fraudulently obtained through loans) to fund renovations, and not providing Mr. Cardenas with a lien on the Washington Property to secure his interest as she purportedly promised to do. They further accused Ms. Shannon of selling a portion of the Washington Property and not paying Mr. Cardenas the sale proceeds.

Ms. Shannon denied the Cardenases' accusations. She denied forging or appending an unauthorized signature page to the Second Amendment. This is consistent with Mr. Cardenas' trial testimony that he signed the Second Amendment, signed his wife's signature, and discussed the terms of the Second Amendment with Pat Horan ("Mr. Horan"), vice-president of Timberland Bank ("Timberland"),

7

the bank from which Ms. Shannon obtained a loan which she used for renovations. Ms. Shannon attested that she had a prospective buyer when she entered into the business venture with Mr. Cardenas. She also attested that she agreed to furnish funds to renovate the Washington Property and pay the Cardenases $1,000,000.00 upon the sale of that property. However, Ms. Shannon denied that she represented any time limitation on completion of the renovations or sale of the property, that she committed to use only her own funds, or that she promised to give Mr. Cardenas a lien on the property. Additionally, the purported $72,000.00 "sale" was actually a payment to MPL in 2010 by the City of Federal Way for its taking of a portion of the Washington Property through condemnation in an eminent domain proceeding.

**D. Trial**

In March of 2014, the bankruptcy court conducted a three-day trial on the issue of non-dischargeability under § 523(a)(2)(A).[4] On September 30, 2014, the bankruptcy court entered findings of fact and conclusions of law in support of its order denying the Cardenases' request for an order declaring the debt created by the Washington state court default judgment non-dischargeable in the Shannons' bankruptcy case. On February 25, 2015, the bankruptcy court entered a judgment discharging all pre-petition indebtedness the Shannons owed to the Cardenases.

In support of its judgment for the Shannons and against the

---

[4]The Cardenases' complaint pled two claims for relief: (1) enforcement of the Washington state court fraud and negligent misrepresentation default judgment; and (2) "fraud under the Bankruptcy Code" based on the Shannons' alleged negligent and intentional misrepresentations.

8

Cardenases, the bankruptcy court made the following specific findings:

(1) That the Shannons did not make any representation to the Cardenases that they knew to be false and they did not make any representations with the intent and purpose of deceiving the Cardenases; and

(2) That any damages suffered by the Cardenases are not a result from reasonably relying on representations by the Shannons.

Minute Entry/Order entered October 1, 2014; Judgment entered February 25, 2015.

The bankruptcy court's ruling was based primarily upon its evaluation of live witness testimony of Mr. Cardenas, Ms. Shannon, and Mr. Horan who dealt with both the Cardenases and Ms. Shannon. The bankruptcy court found Ms. Shannon's testimony credible and consistent with the objective documentary evidence. It found that Ms. Shannon had a letter of intent for $1,700,000.00 from a prospective buyer at the inception of the parties' agreement, she did not represent there was a temporal limit associated with renovations and a sale, she did not commit to use only her funds for renovations, and she did not promise to give Mr. Cardenas a lien on the Washington Property.

On the other hand, the bankruptcy court found Mr. Cardenas' testimony inconsistent with his position in the litigation and other admitted evidence. Some of the more important contradictions noted were: the Cardenases' claim that Ms. Shannon was a trusted advisor upon whom Mr. Cardenas relied for real estate advice was contradicted by Mr. Cardenas' testimony on the first day of trial that he did not rely on her; the Cardenases' claim that Ms. Shannon represented she had a committed buyer who

9

would purchase the Washington Property in three to five months was contradicted by Mr. Cardenas' testimony that Ms. Shannon committed to help him **find** a buyer within three to five months; Mr. Cardenas' claim that funds for renovation would come solely from Ms. Shannon and that he was unaware of and did not authorize loans was contradicted by Mr. Cardenas' admission that he was aware of the loan that Ms. Shannon obtained from Timberland and that the Washington Property was security for that loan; despite his claim that signature pages from the First Amendment were appended to the Second Amendment, Mr. Cardenas admitted he signed the Second Amendment and signed it for his wife after having it in his possession; and Mr. Cardenas' admission at trial that Ms. Shannon did in fact own the Washington Property despite his claim she fraudulently held herself out as an owner to obtain loans.

In post-trial proceedings, the bankruptcy court entered an order, followed by a judgment, awarding the Shannons costs in the amount of $5,002.10 and attorney's fees in the amount of $72,691.00 with interest accruing at the rate set forth in 28 U.S.C. § 1961. It based that award on the parties' joint pre-trial statement which referenced Washington law.

III. **JURISDICTION**

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(I). We have jurisdiction under 28 U.S.C. § 158.

IV. **ISSUES**

1. Was the bankruptcy court clearly erroneous in its findings that Ms. Shannon did not make representations that were

10

false and did not intend to deceive the Cardenases?

2. Did the bankruptcy court err in awarding the Shannons costs and attorney's fees as the prevailing party?

**V.   STANDARD OF REVIEW**

Whether a claim is excepted from discharge presents mixed issues of law and fact, which we review de novo. Diamond v. Kolcum (In re Diamond), 285 F.3d 822, 826 (9th Cir. 2002). When reviewing a bankruptcy court's determination of an exception to discharge claim, we review its findings of fact for clear error and its conclusions of law de novo. Oney v. Weinberg (In re Weinberg), 410 B.R. 19, 28 (9th Cir. BAP 2009). As relevant in this appeal, whether there has been proof of an essential element of § 523(a)(2)(A) is a factual determination reviewed for clear error. Am. Express Travel Related Servs. Co. v. Vinhnee (In re Vinhnee), 336 B.R. 437, 443 (9th Cir. BAP 2005).

"Clearly erroneous review is significantly deferential, requiring that the appellate court accept the [trial] court's findings absent a definite and firm conviction that a mistake has been committed." United States v. Syrax, 235 F.3d 422, 427 (9th Cir. 2000) (citation and internal quotation marks omitted). The bankruptcy court's choice among multiple plausible views of the evidence cannot be clearly erroneous. Anderson v. City of Bessemer City, 470 U.S. 564, 573-75 (1985); United States v. Elliott, 322 F.3d 710, 715 (9th Cir. 2003); Ng v. Farmer (In re Ng), 477 B.R. 118, 132 (9th Cir. BAP 2012). The deference owed to the bankruptcy court is heightened where its choice is based on the credibility of live witnesses. Anderson, 470 U.S. at 575. In fact, we give great deference to the bankruptcy court's

11

findings when they are based on its determinations as to credibility of witnesses. Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010) (citing Anderson, 470 U.S. at 575).

We may affirm the bankruptcy court on any basis supported by the record. See ASARCO, LLC v. Union Pac. R.R. Co., 765 F.3d 999, 1004 (9th Cir. 2014).

**VI.  DISCUSSION**

**A.  The Bankruptcy Court Did Not Err in Finding That the Cardenases Failed to Satisfy Their Burden of Proof on an Element of Their § 523(a)(2)(A) Claim.**

In a non-dischargeability action under § 523(a), the creditor has the burden of proving all the elements of its claim by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 291 (1991). Exceptions to discharge are strictly construed against an objecting creditor and in favor of the debtor to effectuate the fresh start policies under the Bankruptcy Code. Snoke v. Riso (In re Riso), 978 F.2d 1151, 1154 (9th Cir. 1992).

Section 523(a)(2)(A) states as follows:

(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt -

. . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by - (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

11 U.S.C. § 523(a)(2)(A).

A creditor seeking to except a debt from discharge under § 523(a)(2)(A) based on false representations bears the burden of proving by a preponderance of the evidence five elements: (1) misrepresentation(s), fraudulent omission(s), or deceptive

12

conduct; (2) knowledge of the falsity or deceptiveness of such representation(s), omission(s), or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor; and (5) damage to the creditor proximately caused by its reliance. Ghomeshi v. Sabban (In re Sabban), 600 F.3d 1219, 1222 (9th Cir. 2010); In re Weinberg, 410 B.R. at 35. The bankruptcy court found that the Cardenases failed to carry their burden of proving false representations and deceitful conduct by Ms. Shannon. Its decision is not clearly erroneous.

The bankruptcy court identified the representations that the Cardenases accused Ms. Shannon of making to obtain ownership of MPL and the Washington Property without payment as follows:[5]

> (1) that Ms. Shannon had a valid purchase commitment that would permit payment to the Cardenases of $1,000,000.00 within a period of three to five months (the "Buyer and Temporal Representation");
>
> (2) that Ms. Shannon would use only her own funds to renovate the Washington Property (the "Use of Funds Representation");
>
> (3) that the agreement between the parties created an immediate debt (but not a property sale) owed to the Cardenases that was to be secured by a deed of trust (the "Lien Representation"); and
>
> (4) a representation by the Shannons through which they improperly obtained loans that were secured by the Washington Property and use of the loan proceeds for other than MPL purposes (the "Other Deceitful Conduct").

As to each of these matters, the bankruptcy court found either that the representations were not made, or if made were

---

[5]These are consistent with the representations identified in the Cardenases' amended opening brief.

13

not false, and Ms. Shannon's conduct was not deceitful.[6] Supported by the record and based on its assessment of the credibility of the witnesses providing testimony, the bankruptcy court's findings are not clearly erroneous. That holds true even if, as the Cardenases complain on appeal, the bankruptcy judge selected the Shannons' version of events over the Cardenases' version of events.

### 1. The Buyer and Temporal Representation

The Cardenases accused Ms. Shannon of stating that she had a committed buyer who would purchase the property within three to five months of the initial oral agreement. However, Mr. Cardenas contradicted that accusation at trial when he testified as follows:

> Q And can you please describe for the Court what she proposed. In other words, what was she willing to -- what was her offer to you?
>
> A She told me she wanted to help me out as always and that she told me that with three or four months, no more than five months down the road she would **find** me a buyer who would be willing to pay me $1 million for that property.

Trial Tr. (March 25, 2014) at 45:23-46:4 (emphasis added).

In other words, according to Mr. Cardenas, the

---

[6]Although not raised by the parties, we note that the bankruptcy court also recited a "reasonable" reliance standard. Section 523(a)(2)(A) only requires justifiable reliance. Field v. Mans, 516 U.S. 59, 74-75 (1995); In re Sabban, 600 F.3d at 1222; In re Weinberg, 410 B.R. at 35. Nevertheless, because the bankruptcy court's factual findings that Ms. Shannon made no false representations and her conduct was not deceitful are not clearly erroneous, we need not reach the reliance standard used by the bankruptcy court. In the absence of false pretenses, misrepresentations, or deceitful conduct, the Cardenases' § 523(a)(2)(A) claim fails regardless of which reliance standard the bankruptcy court used.

14

representation was actually that Ms. Shannon would help **find** him a buyer for - not that she would actually sell - the Washington Property. And she did just that, it being undisputed that she had a letter of intent from an interested investor for $1,700,000.00 at the inception of the agreement.

As to the three- to five-month time frame, Mr. Cardenas wavered in his testimony. In fact, Mr. Cardenas himself was unsure of the time frame within which Ms. Shannon supposedly told him the Washington Property would be sold. He testified on direct examination that Ms. Shannon "proposed selling [the property] as soon as possible and within two or three months, three or four months." Trial Tr. (March 25, 2014) at 49:22-23. On cross-examination he testified that Ms. Shannon "said from three to five" months. Trial Tr. (March 25, 2014) at 65:11. In short, Mr. Cardenas was unclear and uncertain, and could not definitively articulate what Ms. Shannon supposedly said as to any time frame for a sale.

Mr. Cardenas' claim that Ms. Shannon represented she would renovate and sell the Washington Property within three to five months is further undercut, again, by his own testimony regarding another much easier and better resourced renovation project that took over a year to complete. Trial Tr. (March 25, 2014) at 62-63. That suggests an understanding by Mr. Cardenas that renovation of the Washington Property within three to five months was not likely, and two months was even less likely.

Mr. Cardenas' understanding is consistent with Ms. Shannon's testimony that she "never" told him the Washington Property would be renovated and sold within three to five months, (Trial Tr.

15

(March 25, 2014) at 136:8-10; Trial Tr. (March 26, 2014) at 168:17-23), because a three- to five-month time frame was not possible due to permitting issues for renovations. Trial Tr. (March 26, 2014) at 169:6-8. Ms. Shannon's testimony is also consistent with Mr. Horan's testimony that there was no reference in Timberland's loan file of any mention by Ms. Shannon of a three- to five-month renovation and sale time frame. Trial Tr. (March 26, 2014) at 50:9-11, 55:6-8.

In short, when faced with Mr. Cardenas' contradictory and wavering testimony, both as to renovation and sale of the Washington Property and the timeline for both, we find no error in the version of events that the bankruptcy court accepted. Its findings, supported by the evidence, will not be disturbed. The bankruptcy court's findings related to the Buyer and Temporal Representation are not clearly erroneous.

### 2.   The Use of Funds Representation

To support this representation, the Cardenases pointed to language in the First and Second Amendment that states Ms. Shannon was to "furnish funds" for the renovations. The bankruptcy court also established this as the representation the Cardenases accused Ms. Shannon of making based on the parties' joint pre-trial statement.

Ms. Shannon testified that she did not tell Mr. Cardenas she would use only her funds but did tell him that all necessary funds would be used for renovations to the Washington Property. Trial Tr. (March 25, 2014) at 136:24-137:7. And while Ms. Shannon used a significant amount of her own money for renovations, she also used funds from loans obtained from

16

Timberland and private lenders.

After the Second Amendment made Ms. Shannon the sole member and 100% owner of MPL, she obtained a $250,000.00 loan from Timberland and a $300,000.00 loan from private lenders.[7] Mr. Horan testified that he and Mr. Cardenas were aware that Mr. Cardenas no longer owned 100% of MPL and that 100% of the interest in MPL had been transferred to Ms. Shannon because the two discussed the matter. Trial Tr. (March 26, 2014) at 70-71. Mr. Cardenas also testified that he was aware of the Timberland loan and that the Washington Property was security for that loan because he and Mr. Horan also discussed both matters:

BY MR. DRAKE:

Q  Mr. Cardenas, were you aware that Pat Horan and Timberland Bank were loaning money to Mai Shannon to renovate the building?

A  Yes.

Q  And were you aware that Timberland Bank was going to get a lien in the property for that loan?

A  The property was security for that.

Q  Was security to Timberland Bank?

A  Let me tell you honestly, Pat asked me if she was applying for a loan and I told him it's your money, do you have any security. And he said, yes, the security is your land, your property.

Trial Tr. (March 25, 2014) at 96:6-18. In fact, Mr. Horan testified that Timberland would not have proceeded with the loan to Ms. Shannon if Mr. Cardenas was unaware that the Washington

---

[7]Although loan funds were deposited into accounts other than those maintained by MPL, the bankruptcy court concluded loan funds were not misused. It found no credible evidence that loan funds were used for anything other than renovations.

17

Property was security for the loan. Trial Tr. (March 26, 2014) at 85:4-11.

Based on the testimony described above, the bankruptcy court could easily conclude that Ms. Shannon did not make the Use of Funds Representation. In other words, Mr. Cardenas' knowledge and understanding that Ms. Shannon was using loan funds to renovate the Washington Property is inconsistent with his claim that Ms. Shannon represented that only her funds would be used for renovations. Therefore, the bankruptcy court's finding that the Use of Funds Representation did not support the Cardenases' § 523(a)(2)(A) claim is not clearly erroneous.

### 3. The Lien Representation

While it is true that Ms. Shannon did not place a lien on the Washington Property in favor of Mr. Cardenas, it is equally true that she never represented to Mr. Cardenas that she would. Trial Tr. (March 25, 2014) at 138:3-6; Trial Tr. (March 26, 2014) at 211:2-6.

Mr. Cardenas, on the other hand, could not definitively state if Ms. Shannon ever told him that she would ensure he had a deed of trust on the Washington Property. At first he testified she did. Trial Tr. (March 25, 2014) at 47:1-8. Then he reversed course and testified that she did not:

BY MR. ROMERO:

Q Mr. Cardenas, when you entered into your agreement with Ms. Shannon, did she ever tell you that you would be protected or secured if her buyer didn't come through in buying the property?

A Well, I was told she had a buyer, and that everything was safe, that everything that was going along fine, and --

Q Did she ever tell you that she would give you a deed of trust or lien or something to protect your interest in the property?

A No, my protection was the promise she told me.

Trial Tr. (March 25, 2014) at 54:7-17.[8]

Again, we will not disturb the choice by the bankruptcy court of the version of events it accepted, particularly, when the version accepted is supported by evidence in the record and heavily dependent on the credibility of witnesses. On this record, there is ample support for the bankruptcy court's finding that Ms. Shannon did not promise to provide Mr. Cardenas with a lien on the Washington Property. Therefore, the bankruptcy court's finding in regard to the Lien Representation is not clearly erroneous.

### 4. The Additional Deceitful Conduct

After this case was briefed and before it was argued, the United States Supreme Court decided Husky Int'l Electronics, Inc. v. Ritz, 136 S. Ct. 1581 (2016). In Husky, the Supreme Court held that the term "actual fraud" in § 523(a)(2)(A) includes fraudulent schemes even when those schemes do not involve a false representation.

The parties did not raise Husky during oral argument. However, the Cardenases' amended opening brief includes references to conduct raised at trial which the Cardenases claim was fraudulent. This includes changing the terms of the parties'

---

[8]There also is no reference to any such requirement in the First or Second Amendment, and there is no reference to any such lien in Timberland's credit write-ups until early 2010. Earlier write-ups did not include any such reference.

19

agreement, using the signature page from the First Amendment for the Second Amendment without telling Mr. Cardenas, obtaining loans secured by the Washington Property, and not paying Mr. Cardenas the $72,000.00 MPL received when the City of Federal Way condemned and took a portion of the Washington Property through eminent domain. Since the conduct occurred after the parties agreed to renovate and sell the Washington Property, arguably, it could not have induced Mr. Cardenas to enter into the business venture with Ms. Shannon in the first instance. The Cardenases complain that the bankruptcy court ignored evidence of this conduct. Perhaps a better characterization, and a more accurate one, is that the bankruptcy judge assessed credibility, found that the Cardenases lacked it, and concluded either these events did not occur or, if they did, they were not fraudulent because Mr. Cardenas knew of and consented to them. In any event, the above-described conduct does not implicate Husky.

The terms of the agreement were not changed without Mr. Cardenases' knowledge or consent. The First Amendment was prepared by Ms. Shannon's lawyer after discussions with Mr. Cardenas. Trial Tr. (March 25, 2014) at 132, 138. That document was given to Mr. Cardenas by one of Ms. Shannon's employees. Trial Tr. (March 25, 2014) at 51-51, 77. It was also reviewed by one of Mr. Cardenas' daughters who assists with business matters. Trial Tr. (March 25, 2014) at 77.

With regard to the Second Amendment, Mr. Cardenas claimed the document was forged or fabricated, and he did not know about it. Mr. Cardenas accused Ms. Shannon of tricking him into signing the First Amendment and then taking the signature page

20

from the First Amendment and attaching it to the Second Amendment without his knowledge. Not only does that make no sense because the First Amendment admitted at trial was not signed, (Trial Tr. (March 25, 2014) at 131:19-132:1, 138:7-9, and Appellants' Excerpts of Record BAP dkt 21 Tab 13 p. 191-192), but Mr. Cardenas admitted during trial that he signed the Second Amendment - admitted as Exhibit 18 - and he signed it for his wife:

BY MR. DRAKE:

Q Let me start with this. Mr. Cardenas, please look at the screen right now. I'll try and mark -- is that your signature there beside the marking?

A That is my signature.

Q And what about the signature for your wife; do you recognize that signature?

A No, that's not my wife's signature.

Q And how do you know that?

A Real well. I've lived with her 38 years.

Q And you did not sign your wife's signature there?

A I signed.

Q Oh, so you're saying it's not your wife's signature because you signed it, not her?

A Because Mai told me it would be valid, that ultimately everything would be taken care of soon enough.

Q But is it you that signed for your wife on this document then?

A Yes, I'm telling yes.

Q Okay. And then your signature, you signed that one as well?

A I signed it. How could I? I cannot deny that.

21

Trial Tr. (March 25, 2014) at 87:8-88:4.[9]

As discussed above in the context of the Use of Funds Representation, Mr. Cardenas also testified that he was aware of the Timberland loan. More precisely, he testified that he was aware that Ms. Shannon obtained a loan from Timberland to fund renovations because he discussed both the loan and the use of the Washington Property as security for the loan with Mr. Horan. Moreover, at the time Ms. Shannon obtained the Timberland loan she owned 100% of MPL which owned the Washington Property. In that regard, Ms. Shannon's conduct was not deceitful.

That is also true with respect to the $72,000.00 that MPL received from the City of Federal Way during the time the city condemned and took a portion of the Washington Property through eminent domain. That occurred in 2010 and, thus, when Ms. Shannon owned 100% of the interest in MPL. Moreover, those proceeds were received upon condemnation through eminent domain - not a sale - which means the transaction would not have triggered any obligation that Ms. Shannon may have had to pay those funds to Mr. Cardenas upon a sale of the Washington Property.

### 5. Conclusion

We find no error with the bankruptcy court's conclusion that the above-described representations and conduct are not false or deceitful and, thus, are insufficient to support the first element of the Cardenases' § 523(a)(2)(A) claim. Because its factual determinations are supported by the record, we cannot say

---

[9]The Cardenases never explained how the signature page of Exhibit 17, without signatures, could be swapped for a signature page on Exhibit 18 with signatures.

22

that the bankruptcy court's decision is clearly erroneous. Therefore, as to the order and judgment that the debt created by the Washington state court default judgment is dischargeable, we AFFIRM.

**B.    The Bankruptcy Court Erred When it Awarded Attorney's Fees to the Shannons.**

Unless prohibited by a federal statute or the Bankruptcy Rules, a prevailing party in an adversary proceeding is typically awarded its costs other than attorney's fees. See Fed. R. Bankr. P. 7054(b)(1). Here, the bankruptcy court awarded the Shannons $5,002.10 in costs apart from its award of $72,691.00 in attorney's fees. The Cardenases' amended opening brief does not articulate a separate argument that the bankruptcy court erred in its award of costs to the Shannons. An issue not raised by a party in its opening brief is generally deemed waived. Rivera v. Orange County Probation Dept. (In re Rivera), 511 B.R. 643, 649 (9th Cir. BAP 2014). Therefore, as to the award of costs other than attorney's fees to the Shannons in the amount of $5,002.10, we AFFIRM.

We turn now to attorney's fees. Mr. Cardenas asked the bankruptcy court to determine that his Washington state court default judgment against the Shannons be deemed excepted from discharge for fraud and false representations. Essentially, Mr. Cardenas alleged that Ms. Shannon induced him to sign and execute the First Amendment to the Limited Liability Company Operating Agreement of Mazatlan Property, LLC (January 1, 2016) ("Operating Agreement") by making false representations about the substance of that agreement and then by committing actual fraud

23

when she allegedly removed the parties' signature page from the First Amendment and attached it to the Second Amendment, which effectively transferred his interest in the Washington Property to her. In her answer and at trial, Ms. Shannon both denied Mr. Cardenas' allegations and showed that her conduct was consistent with the Operating Agreement as amended. In other words, her defense was not simply a denial of fraud allegations but an assertion of her right to act as she did based upon the parties' written agreement. After hearing the evidence, the bankruptcy court did not accept Mr. Cardenas' testimony and instead found Ms. Shannon's testimony more credible.

The executed Second Amendment provides "except as amended by this agreement, the other provisions of the operating agreement shall remain in full force and effect and hereby ratified and confirmed." In the Operating Agreement, there is an attorney's fees provision that provides:

> Section 12.3 Attorney's Fees. If any litigation or other dispute resolution proceeding is commenced between parties to this Agreement to enforce or determine the rights or responsibilities of such parties, the prevailing party or parties in any such proceeding will be entitled to receive, in addition [to] such other reliefs as may be granted, its or their reasonable attorney's fees, expenses and costs incurred preparing for [sic] participating in such proceedings.

Operating Agreement at Section 12.3. Significantly, the scope of this bilateral attorney's fees provision is quite broad and likely its sweep reached issues raised by Ms. Shannon's defense.

Before trial the parties filed a proposed joint pre-trial order but it was not signed by the court. However, the parties and the court thereafter treated it as a joint pre-trial statement. Under the heading Agreed Issues of Law, the joint

24

pre-trial statement stated:

> The court may award attorney fees to the prevailing party on any claim arising out of contract. RCW 4.84.330.

Relying upon the joint pretrial statement, the bankruptcy court awarded attorney's fees and costs to Ms. Shannon for the reason that "the parties stipulated that the court may make an award of attorney fees and costs to the prevailing party." This is the only explanation that the court provides for its award of attorney's fees. The court's decision referenced, but does not explain, the applicability of the attorney's fees provision in the Operating Agreement.

RCW 4.84.330 is a fee shifting statute that regulates unilateral attorney's fees provisions, making them bilateral. Because the agreement at issue here contained a bilateral fee provision, RCW 4.84.330 did not apply. "By its terms, RCW 4.84.330 applies only to contracts with unilateral attorney fee provisions." Kaintz v. PLG, Inc., 147 Wash. App. 782, 786, 197 P.3d 710 (2008). Moreover, a stipulation by the parties to the law does not bind a trial court or an appellate court. Modeer v. United States, 183 F. A'ppx 975, 977 (Fed. Cir. 2006); Avila v. INS, 731 F.2d 616, 620-21 (9th Cir. 1984); Worden v. Smith, 178 Wash. App. 309, 327, 314 P.3d 1125 (2013). The bankruptcy court's reliance on the joint pre-trial statement as opposed to the Operating Agreement's attorney's fees provision for its award of attorney's fees was error.

"[U]nder Cohen [v. de la Cruz, 523 U.S. 213 (1998)], the determinative question for awarding attorney's fees is whether the creditor would be able to recover the fee outside of

25

bankruptcy under state or federal law." Fry v. Dinan (In re Dinan), 448 B.R. 775, 785 (9th Cir. BAP 2011) (citations omitted). Notably, Cohen is not limited to attorney's fees awarded under state or federal statutes; it also applies to cases in which fees are provided for by contract. Redwood Theaters, Inc. v. Davison (In re Davison), 289 B.R. 716, 722 (9th Cir. BAP 2003). Under the rationale of Renfrow v. Draper, 232 F.3d 688, 694 (9th Cir. 2000), and Heritage Ford v. Baroff (In re Baroff), 105 F.3d 439, 441 (9th Cir. 1997), a prevailing debtor also can recover attorney's fees, provided the parties have a written agreement which would award fees to the debtor if the same issues were tried in a state court.

The rule in Washington is that, absent a contract, statute or recognized ground of equity, attorney's fees will not be awarded as part of the cost of litigation.[10] Pennsylvania Life Ins. Co. v. Emp't Sec. Dep't, 97 Wash. 2d 412, 413, 645 P.2d 693 (1982). Under Washington law, attorney's fees in contract cases may be awarded if the contract contains a provision specifically providing for attorney's fees upon breach or other stipulated circumstances. For purposes of a contractual attorney's fees provision, an action is on a contract if the action arose out of the contract and if the contract is central to the dispute. Hemenway v. Miller, 116 Wash. 2d 725, 742, 807 P.2d 863 (1991).

---

[10]The parties stipulated to the applicability of Washington state law, which is appropriate given that the business venture between the Cardenases and Shannons arose in Washington, the property in question is located in Washington, and the judgment giving rise to the Shannons' debt to the Cardenases was issued by a Washington state court.

26

The meaning of "on the contract" is explained in <u>Boguch v. Landover Corp.</u>, 153 Wash. App. 595, 615, 224 P.3d 795 (2009), and <u>Brown v. Johnson</u>, 109 Wash. App. 56, 58-59, 34 P.3d 1233 (2001). In <u>Boguch</u>, the court held that "[i]f a party alleges breach of a duty imposed by an external source, such as a statute or the common law, the party does not bring an action on the contract, even if the duty would not exist in the absence of a contractual relationship." <u>Boguch</u>, 153 Wash. App. at 615. Boguch sued his realtors for breach of contract and negligence, contending that their mistakes caused his property to lose value. His case was dismissed on summary judgment and his realtors were awarded attorney's fees based upon a provision in the listing agreement. <u>Id.</u> at 606-07. On appeal, the court reversed the attorney's fees award and remanded, stating that Boguch's negligence claims were not "on the contract" because they concerned breaches of duties imposed by statute and common law. <u>Id.</u> at 619. The case was remanded to the trial court with instructions to recalculate the attorney's fees award, limiting it to fees arising from the contract claim. <u>Id.</u> In <u>Brown</u>, the purchaser of the house sued the vendor for misrepresenting the house's condition. The court awarded attorney's fees to the purchaser for her misrepresentation claim against the seller because the purchase and sale agreement provided for attorney's fees to the prevailing party "concerning this agreement," and the tort arose from the parties' agreement. <u>Brown</u>, 109 Wash. App. at 58-59.

These Washington cases are consistent with Ninth Circuit case law. In <u>Baroff</u>, Baroff's creditors, like Mr. Cardenas, disputed the dischargeability of their debt to him, alleging that

27

they were induced to enter into a settlement agreement by fraud and false representations. Like Ms. Shannon, Baroff based his defense upon the parties' written settlement agreement. He prevailed because the bankruptcy court ruled that the statute of frauds barred the oral statements purporting to amend or supplement the written agreement. Baroff, 105 F.3d at 442. Although he prevailed, Baroff's request for attorney's fees was denied. Id. at 441. The Ninth Circuit reversed, reasoning that because the bankruptcy court was required to determine whether the statute of frauds applied to the creditors' fraudulent inducement claim before ruling on the question of dischargeability, "the document containing the attorney fees clause in this case played an integral role in the proceedings." Id. at 442.

Baroff was clarified by the Ninth Circuit's subsequent decision in Renfrow. In that case, the court stated that the rule in Baroff does not permit the bankruptcy court to award a party's attorney's fees for litigating federal law issues in bankruptcy court whenever a state law is "integral" to determining dischargeability. Renfrow, 232 F.3d at 694. Instead, the court held that attorney's fees should be awarded solely to the extent they were incurred in litigating state law issues. Id. Likewise the rule in Washington is that if attorney's fees are recoverable for only some of the parties' claims, the award "must properly reflect a segregation of the time spent on issues for which fees are authorized from time spent on other issues." Hume v. Am. Disposal Co., 124 Wash. 2d 656, 673, 880 P.2d 988 (1994).

28

Here, the parties' agreement contained an attorney's fees provision awarding fees to the prevailing party in any litigation between them to enforce or determine their respective rights and responsibilities.  In part, Ms. Shannon responded to Mr. Cardenas' fraud allegations by maintaining that the Second Amendment to the Operating Agreement was validly executed and by showing that her conduct was consistent with the amended agreement.  To the extent that she litigated those state law issues before the bankruptcy court and prevailed, she was entitled to an award of reasonable attorney's fees.

In conclusion, the bankruptcy court's award of attorney's fees is VACATED because it is based on an erroneous application of the law.  Upon REMAND, the bankruptcy court should base its award of attorney's fees upon the fees provision of the parties' Operating Agreement, and the court should limit its award to the fees incurred in litigating state law issues under that provision.

**VII.  CONCLUSION**

Based on the foregoing, we AFFIRM the bankruptcy court's ruling that the Cardenases failed to meet their burden of proof in establishing non-dischargeability under § 523(a)(2)(A) and its judgment that the debt created by the Washington state court default judgment is discharged in the Shannons' bankruptcy case, we AFFIRM the bankruptcy court's order and judgment awarding the Shannons $5,002.10 in costs, and we VACATE and REMAND the bankruptcy court's order and judgment awarding the Shannons $72,691.00 in attorney's fees.

29